*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EDWARD PINCHON,

  *Petitioner-Appellant,*

  *v.*

  No. 07-6496

KEVIN MYERS, Warden,

  *Respondent-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00237—William J. Haynes, Jr., District Judge.

Argued: March 10, 2010

Decided and Filed: August 4, 2010

Before: COLE, GILMAN, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Caryll S. Alpert, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Frank R. Borger-Gilligan, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Caryll S. Alpert, Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Frank R. Borger-Gilligan, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

  GILMAN, J., delivered the opinion of the court, in which COLE and WHITE, JJ., joined. COLE, J. (pp. 17-19), delivered a separate concurring opinion, in which WHITE, J., also joined.

_____

**OPINION**

_____

  RONALD LEE GILMAN, Circuit Judge. Edward Pinchon was convicted of first-degree murder and sentenced to life in prison for the killing of his adult male lover. Pinchon, who was 17-years old at the time of his arrest, was transferred from juvenile court to a state

1

criminal court to be tried as an adult. After exhausting his direct appeals without success, he returned to the state trial court with a petition for postconviction relief. The state trial court dismissed Pinchon's petition because it was filed after the expiration of Tennessee's one-year statute of limitations for such claims.

Prior to this dismissal, Pinchon had also filed a petition for a writ of habeas corpus in the federal district court, asserting insufficiency of the evidence and faulty jury instructions as grounds for relief. He later filed an amended petition that added two ineffective-assistance-of-counsel claims after the state courts ruled against him. The district court dismissed Pinchon's ineffective-assistance-of-counsel claims as untimely and procedurally defaulted, and it further concluded that Pinchon's insufficiency-of-the-evidence and jury-instruction claims, which were pursued on direct appeal in state court, had no merit.

On appeal, Pinchon limits his challenges to the district court's rulings regarding his ineffective-assistance-of-counsel and insufficiency-of-the-evidence claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

The parties do not dispute the underlying facts in this case. They are set forth in the opinion of the Tennessee Court of Criminal Appeals as follows:

> . . . The defendant was seventeen years old on April 21, 1997, and he had been spending time, including overnight visits with the victim, Leslie Handy, a 42 or 43 year-old homosexual male. Although the defendant slept in the victim's bed when he stayed overnight, he testified that their sexual activity was limited to the victim fellating him. The victim occasionally purchased clothes for the defendant, and at the victim's request, the defendant kept these clothes at the victim's residence.
>
> Much of the evidence inculpating the defendant came from the testimony of Mary Jones, who was the victim's neighbor and had known him since he was a young boy when he had gone to school with her children. She had known about the victim's relationship with the minor defendant for "six months to a year." She testified the defendant would stay at the victim's house for about five nights a week and that they got along "pretty good." However, three or four days before April 21, she was in her lawn talking to

the victim, who was a few feet away inside his kitchen, when she heard a slap. The victim said the defendant had slapped him, and the victim threatened to hit the defendant with a skillet. The defendant spent the night of April 20-21 at the victim's residence, and the victim took him to school on the morning of April 21.

On the evening of April 21, Jones was visiting with the victim in his house when the defendant arrived in the company of three other boys. At one point, the defendant playfully wrestled with the victim, who was wearing a "moo-moo" style dress and was seated [o]n the living room floor. Jones testified that the defendant then went to the back of the house, returned to the living room with a shotgun, and ordered everyone to leave "because they was fixing to make love." The victim, who was not taking the defendant seriously, told him to stop acting the fool and to put away the shotgun. At some point, the defendant said he would "bust[ ] [the victim's] head to the fat." However, the defendant put away the shotgun, and he and his three companions left.

A few minutes later, the victim's phone rang, and Jones answered to find the defendant on the line. The defendant said he wanted to speak to the victim and that he was "going to kill that bitch." She gave the phone to the victim, who conversed with the defendant. Approximately fifteen minutes later, the defendant and his three companions returned to the victim's house. Jones was still present and quoted the defendant as saying, "How much you bet I won't kill that g-d_____ bitch?" The defendant then told Jones that if she didn't want to see what happened she had better leave. When the defendant pulled a .22 pistol out of his jogging pants, Jones retreated to her apartment next door. Ten seconds later, as she reached her steps, she heard a shot. As she stepped inside the door, she heard four or five more shots. She heard footsteps on the gravel outside and looked out to see the defendant and two of the boys running along the driveway. A neighbor who was outdoors a few houses away testified that he heard shots and then saw five or six young men run to a dark car and drive away.

Jones called the police, who arrived and found the victim's eyeglasses on the porch and his slippers between the storm door and the closed, wooden front door of the house. There were bullet holes in the door frame that indicated that bullets had struck the frame from the outside of the house. Inside, they found the victim [o]n the floor, clutching the telephone, dead from a .22 bullet wound to the heart.

The theory of the defense was posited by the testimony of the defendant and two of the other young men, Vernon Grigsby and Jeffrey Pinchon [Edward's cousin],who visited the victim's home that night. Although their stories conflicted in several respects, Grigsby, Jeffrey Pinchon, and the defendant testified that they and Josh Graham went in Graham's car to the victim's house twice on the evening of April 21, because the defendant wanted to get his clothes. During the first visit, the

defendant playfully wrestled with the victim and procured the shotgun; however, they denied that the defendant made the love-making comment and denied that he threatened the victim in any way. The defendant retrieved a couple of items of clothing, and they left. In an hour or two, after the defendant decided that he wanted the rest of his clothes, they returned. The defendant put his clothes in a bag, and the defendant, Jeffrey Pinchon, and Grigsby went down the driveway and left Josh Graham behind. The defendant and Jeffrey Pinchon said that they raced to Graham's car in order to claim the front seat. Grigsby testified that Graham and the victim were having words on the victim's porch. The trio heard shots. Grigsby saw the victim falling through the front door and the door closing. They testified that Graham, with .22 pistol in hand, fled to the car.

All four got into the car, and Graham drove away. Grigsby testified that Graham threatened "to hurt us if we said anything." Jeffrey Pinchon testified that no one mentioned the shooting. Graham let the three boys out and left. None of the boys called the police.

On July 31 or August 1, 1998, the defendant was arrested. On April 15, 1999, Josh Graham was murdered. The parties entered a stipulation of fact which indicated that a person had been charged with Graham's murder, that the case was apparently unrelated to the case on trial, and that the defendant had given the state notice of its defense that Graham was the perpetrator sometime in the weeks before Graham was killed.

*State v. Pinchon*, No. M1999-00994-CCA-R3-CD, 2000 WL 284071, at *1-*3 (Tenn. Crim. App. Mar. 17, 2000) (alterations in original) (footnotes omitted).

**B.      Procedural background**

Because he was 17-years old at the time of his arrest, Pinchon initially faced charges in juvenile court. Following a hearing to determine whether Pinchon should be tried as an adult, the juvenile court concluded in the affirmative and exercised its discretion to transfer Pinchon to the Davidson County Criminal Court.

Pinchon was convicted by a jury of first-degree murder and sentenced to life imprisonment. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Pinchon's conviction and sentence, rejecting his arguments that there was insufficient evidence to support his conviction and that one of the jury instructions violated his due process rights. Pinchon then filed a pro se application for permission to appeal with the Tennessee Supreme Court, which was denied on December 11, 2000. *Pinchon v. State*, No. M2003-00816-CCA-R3-PC, 2004 WL 193055, at *1 (Tenn. Crim. App. Jan. 28, 2004).

Although Pinchon's current counsel maintains that Pinchon never received notice of this denial, Pinchon testified at his state postconviction proceeding that he did in fact receive a letter from the Tennessee Supreme Court notifying him of its refusal to hear his appeal. In addition, in Pinchon's petition for postconviction relief, signed by him on December 28, 2001, Pinchon stated that the Tennessee Supreme Court denied his request for permission to appeal on December 11, 2000, demonstrating that he knew about the denial and the date it was issued. There is no evidence in the record indicating that this notice was untimely or inadequate in any way.

Approximately three months later, on March 8, 2001, Pinchon filed a pro se petition for a writ of habeas corpus in the United States District Court for the Middle District of Tennessee, bringing the same two claims that he had raised on appeal in the state appellate court. Evidently having forgotten the prior notice that he had received informing him that his application for permission to appeal had been denied, or not understanding its effect, Pinchon mailed a letter to the Tennessee Supreme Court in September 2001, seeking an update regarding the status of his appeal. The request read in full: "I would like to know the status of my pending Motion to Reconsider. The last date I received any information was on 12-29-00. Since then I have not heard anything." (The record does not clarify what Pinchon is referring to when he mentions a "Motion to Reconsider," there being no evidence that any such motion was filed.) In response to this inquiry, Pinchon received a handwritten, unsigned, and undated note from the Tennessee Supreme Court that read: "On 12/29/00, the case was mandated (closed) & jurisdiction was returned to the trial court. Nothing currently pending because the case is closed." Pinchon maintains that, with the help of a fellow inmate, he understood this note to indicate that his conviction was final on December 29, 2000 and that he had one year from that date to file for postconviction relief.

While his habeas petition was pending in the district court, Pinchon also filed a pro se petition for postconviction relief in the Davidson County Criminal Court. Pinchon mailed this petition on December 28, 2001, one year and 17 days after the Tennessee Supreme Court denied his application for permission to appeal. He obtained counsel shortly after the filing. The state trial court held two evidentiary hearings regarding Pinchon's petition, during which Pinchon informed the court about his receipt of the handwritten note

from the Tennessee Supreme Court and presented evidence that he had been diagnosed as having a mild form of mental retardation.

Finding that Pinchon's petition was not filed within the one-year statute of limitations for seeking postconviction relief, and that Pinchon had not demonstrated mental incompetence sufficient to excuse his tardy filing, the Davidson County Criminal Court granted the State's motion to dismiss. That ruling was affirmed by the Tennessee Court of Criminal Appeals. The Tennessee Supreme Court then denied Pinchon's application for permission to appeal.

Meanwhile, the district court, which had been holding Pinchon's habeas petition in abeyance pending his exhaustion of state-court remedies, reopened the petition on August 4, 2004, following the Tennessee Supreme Court's denial of Pinchon's application. On March 1, 2005—nearly four years after filing his original petition—Pinchon filed a motion to amend his petition to add ineffective-assistance-of-counsel claims regarding both the transfer hearing in juvenile court and the conduct of his trial. The district court never directly ruled on this motion. Instead, it granted the State's motion for summary judgment, concluding that there was sufficient evidence to support Pinchon's conviction, that any error regarding the jury instructions at trial was harmless, and that Pinchon's ineffective-assistance-of-counsel claims were both untimely and procedurally defaulted.

The district court, on June 10, 2008, certified two issues for Pinchon to pursue on appeal: (1) whether he received ineffective assistance of counsel at trial, and (2) whether there was sufficient evidence presented at trial to sustain Pinchon's conviction. Shortly thereafter, on November 14, 2008, Pinchon filed a motion in this court to expand the Certificate of Appealability (COA) to include the issue of whether he received ineffective assistance of counsel in the juvenile court at his transfer hearing. This court, construing Pinchon's notice of appeal as a motion to expand the COA, issued an order denying expansion of the COA on December 31, 2008. That order, however, made no mention of Pinchon's motion to add a claim for ineffective assistance of counsel at the transfer hearing. Rather, the order declined to expand the COA to address the jury-instruction claim that Pinchon had raised in the district court. The order concluded by stating that "[t]he case will proceed on the issues certified for appeal by the district court: whether Pinchon received

reasonably effective assistance of counsel at trial and whether the State's proof was sufficient to support Pinchon's conviction."

Pinchon then filed his principal brief in this case. In addition to addressing the two issues certified for appeal, Pinchon challenges the district court's dismissal of his amended petition as untimely, and he raises the claim that he received ineffective assistance of counsel at the juvenile court transfer hearing. On April 7, 2009, prior to filing its principal brief, the State filed a motion to strike the portions of Pinchon's brief regarding the timeliness of his amended petition and his ineffective-assistance-of-counsel claim insofar as it pertains to the transfer hearing. The State contends that neither of these arguments was certified for appeal. We have not previously ruled on the State's motion to strike.

## II.  ANALYSIS

### A.     Standard of review

"We review de novo a district court's decision to grant or deny a petition for a writ of habeas corpus." *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). Both the district court and this court are bound to apply the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) in this case because Pinchon filed his petition after AEDPA's effective date. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a "claim that was adjudicated on the merits in State court proceedings" only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Joseph*, 469 F.3d at 449-50 (brackets, citation, and internal quotation marks omitted). On the other hand, a state-court decision involves an unreasonable application of clearly

established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Joseph*, 469 F.3d at 450 (citation omitted).

AEDPA's deferential standard of review, however, "applies only to any claim that was adjudicated on the merits in [s]tate court proceedings." *Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007) (citation and internal quotation marks omitted). We must therefore apply the de novo standard of review to claims properly before us where no ruling was made on the merits by the Tennessee state courts. *See id*. at 450.

**B.    Scope of the COA**

As a preliminary matter, we must clarify what issues are properly before us. The State contends that Pinchon cannot pursue his ineffective-assistance-of-counsel-at-transfer-hearing claim or his arguments regarding the timeliness of his amended petition because neither the district court nor this court granted a COA as to those issues. According to the State, we thus lack jurisdiction over those issues in the absence of a COA specifically referencing them.

In response to the State's argument, Pinchon contends that we should consider his ineffective-assistance-of-counsel claim as it relates to his transfer hearing because neither the district court's order nor this court's December 31, 2008 order clarify the scope of the COA. This assertion is only partially accurate. The district court's order granting a COA on two issues makes clear that Pinchon's ineffective-assistance-of-counsel claim relates only to his attorney's performance "at trial."

We first observe that our resolution of Pinchon's motion to expand the COA will not affect the outcome of his appeal. As discussed below in Part II.C.1., Pinchon's amended petition, in which he first raised his ineffective-assistance-of-counsel-at-transfer-hearing claim, was untimely in the district court. This means that even if we were to grant Pinchon's motion to expand the COA to include the transfer-hearing claim, Pinchon would still not be

entitled to any relief. His motion is therefore moot, which also moots the State's motion to strike insofar as it is related to the transfer-hearing claim.

We now turn to the State's motion to strike as it pertains to Pinchon's arguments about the timeliness of his amended petition. "Although it is a statutory requirement that a COA reference the specific issue to be addressed on its face, a procedural issue that possibly bars addressing an underlying constitutional claim is an appropriate matter to be addressed under a COA." *Lordi v. Ishee*, 384 F.3d 189, 193-94 (6th Cir. 2004) (citation omitted) (addressing a procedural-default issue where the district court granted a COA only as to the merits of a petitioner's juror-bias claim); *see also Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1258 (11th Cir. 2002) ("Unless we review a district court's threshold ruling that a claim is procedurally barred from consideration, it would be a waste of our time to consider the merits of the claim.").

The district court in the instant case granted a COA on the substance of Pinchon's ineffective-assistance-of-counsel-at-trial claim, but denied a COA as to the timeliness issue on the basis that Pinchon "did not present proof to support his equitable tolling contentions." But before we can reach the merits of the ineffective-assistance-of-counsel-at-trial claim, we must first address the timeliness of Pinchon's amended petition. Pinchon's timeliness arguments therefore constitute an "appropriate matter" to be addressed under the COA.

In sum, we decline to expand the COA to include Pinchon's ineffective-assistance-of-counsel-at-transfer-hearing claim on the basis of the analysis below. On the other hand, we deny the State's motion to strike Pinchon's arguments regarding the timeliness of his amended petition because the resolution of this issue is an inherent part of the analysis of his remaining ineffective-assistance-of-counsel claim.

**C.       Ineffective-assistance-of-counsel-at-trial claim**

The district court granted summary judgment to the State on Pinchon's ineffective-assistance-of-counsel-at-trial claim, concluding that (1) Pinchon had failed to file his amended petition containing this claim within the one-year statute of limitations for filing federal habeas petitions, and (2) in any event, the claim was procedurally defaulted. Pinchon now appeals both of these determinations.

### 1.     *Timeliness of Pinchon's amended petition in federal court*

Under AEDPA, a petitioner has one year from the time that his or her judgment becomes final on direct appeal to file a petition for habeas corpus in federal court. 28 U.S.C. § 2244(d)(1)(A).   This statute of limitations "begins to run from the latest of four circumstances, one of which is the 'date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review.'"   *Sherwood v. Prelesnik*, 579 F.3d 581, 585 (6th Cir. 2009) (quoting § 2244(d)(1)(A)).  But "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending" does not count against a petitioner when calculating the filing deadline under § 2244(d)(1)(A).   28 U.S.C. § 2244(d)(2).

The Tennessee Supreme Court denied review of Pinchon's conviction on December 11, 2000.  Pinchon's conviction therefore became final on March 12, 2001, the first non-weekend day following the expiration of the 90-day period during which he was eligible to petition the Supreme Court for certiorari.  *See Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (recognizing that "direct review" under § 2244(d)(1)(A) includes review by the Supreme Court); Fed. R. App. P. 26(a)(1)(c).  He filed his initial habeas petition in the district court on March 8, 2001, well before the one-year AEDPA deadline expired. Pinchon's original habeas petition was therefore timely.

But Pinchon's original habeas petition contained only his insufficiency-of-the-evidence and jury-instruction claims.  He did not raise his ineffective-assistance-of-counsel claims until he filed an amended petition on March 1, 2005, well after the one-year statute of limitations had run.   A portion of this nearly four-year gap is excused because of Pinchon's state-court postconviction proceedings. On December 28, 2001, Pinchon initiated postconviction proceedings in state court, which tolled the AEDPA statute of limitations until May 10, 2004, at which time the Tennessee Supreme Court denied him relief.  *See id*. at 337 ("[T]he filing of a petition for certiorari before [the Supreme] Court does not toll the statute of limitations under § 2244(d)(2)."); *Allen v. Bell*, 250 F. App'x 713, 714-15 & n.1 (6th Cir. 2007) (applying *Lawrence* retroactively where, as here, the petitioner did not argue

any reliance on this court's pre-*Lawrence* precedent that tolled the 90-day period for seeking certiorari to the Supreme Court following state postconviction review).

Assuming that Pinchon's state petition was "properly filed" under § 2244(d)(2), it tolled the habeas statute of limitations for the approximately two-and-a-half years while it was pending. But this tolling does not help Pinchon because he waited almost an additional ten more months before filing his amended habeas petition in the district court. These ten months, plus the nine-and-a-half months between the date on which Pinchon's conviction became final and his filing for state postconviction relief, combine to render Pinchon's amended habeas petition untimely.

In an effort to overcome this late filing, Pinchon raises two arguments. He first contends that he is entitled to equitable tolling of the one-year statute of limitations. "Because [t]his one-year statute of limitations is not jurisdictional, a petitioner who misses the deadline may still maintain a viable habeas action if the court decides that equitable tolling is appropriate." *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "In a case like the present one, where the facts are undisputed and the district court decides as a matter of law that equitable tolling does not apply, this court reviews the district court's decision de novo." *Id.* at 401.

> We consider five factors in determining whether equitable tolling should apply:
>
> (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

*Id.* (citation omitted). The absence of any prejudice to the opposing party "is a factor to be considered only after a factor that might justify tolling is identified." *Id.* at 401-02 (citation omitted).

In assessing the timeliness of Pinchon's amended petition, the district court determined that Pinchon's mental retardation did not excuse his late filing. The district court relied on the state courts' determination that Pinchon's mild mental retardation did not render him unable to manage his court filings or participate in the state-court proceedings

in concluding that his mental condition similarly did not hinder him in federal court.  It further noted that Pinchon obtained counsel several years before filing his amended complaint.

Pinchon does not challenge the district court's analysis in this regard and, in arguing for equitable tolling, he makes only the general allegation that the State would not be prejudiced by any tolling.  But we cannot consider the absence of prejudice to the State until Pinchon identifies a factor that would support equitable tolling.  *See id*.  Because Pinchon fails to identify such a factor, we affirm the district court's equitable-tolling ruling.

In addition to his equitable-tolling argument, Pinchon maintains that his ineffective-assistance-of-counsel claims contained in the amended petition are timely because they "relate back" to the claims in his original petition under Rule 15(c)(1) of the Federal Rules of Civil Procedure.  (Although Pinchon characterizes the relation-back theory as a justification for equitable tolling, these are actually two separate theories.  *See, e.g.*, *Watkins v. Lujan*, 922 F.2d 261, 263 (5th Cir. 1991) ("[T]he issue of equitable tolling is distinct from the relation-back theory under Fed. R. Civ. P. 15(c).").)  The district court rejected Pinchon's relation-back argument, holding that his ineffective-assistance-of-counsel claims did not relate back because they were not tied to the same "common core of operative facts" as the original-petition claims, as required by *Mayle v. Felix*, 545 U.S. 644, 664 (2005).

In *Mayle*, the Supreme Court resolved a circuit split regarding how broadly to interpret the relation-back provision contained in the former Rule 15(c)(2) of the Federal Rules of Civil Procedure (Rule 15(c)(1) as of December 1, 2007) in the context of habeas proceedings.  The Court adopted a narrow reading of the Rule, concluding that an amended habeas petition does not relate back where it asserts a new ground for relief supported by facts that differ from those in the original petition.  *Id*. at 650.  Instead, the claims in the original and amended petitions must be "tied to a common core of operative facts."  *Id*. at 664.  Pinchon contends on appeal that because *Mayle* was decided in June 2005—approximately three months after he filed his amended petition—the district court erred by applying that case's relation-back standard to his filing.

This court has not specifically held that the *Mayle* relation-back standard applies to pre-*Mayle* cases, but on two occasions it has applied the *Mayle* standard in dismissing, as

time-barred, amended petitions filed before that case was decided. *See Evans v. United States*, 284 F. App'x 304, 313 (6th Cir. 2008) (applying the *Mayle* standard to an amended petition filed in 2004); *Wiedbrauk v. Lavigne*, 174 F. App'x 993, 1001-02 (6th Cir. 2006) (citing *Mayle* in affirming the dismissal of an amended petition filed in 2004). Other circuits have taken a similar approach. *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 241 (4th Cir. 2008) (applying *Mayle* to an amended petition filed in 2004); *Hebner v. McGrath*, 543 F.3d 1133, 1137-39 (9th Cir. 2008) (applying *Mayle* to an amended petition filed in 2003); *United States v. Ciampi*, 419 F.3d 20, 23-24 (1st Cir. 2005) (applying *Mayle* to an amended petition filed in 2002); *McLean v. United States*, No. 04-13534, 2005 WL 2172198, at *1-*2 (11th Cir. Sept. 8, 2005) (relying on *Mayle* to revise, upon a motion for rehearing, a panel decision filed ten days before *Mayle* that had allowed the petitioner's amended petition to relate back to the original petition).

These cases lead us to the conclusion that the *Mayle* Court's resolution of the circuit split regarding the proper interpretation of the former Rule 15(c)(2) was a clarification of existing law and that, as such, this interpretation should be applied retroactively. *See Williamson v. Parke*, 963 F.2d 863, 867 (6th Cir. 1992) (explaining that where the Supreme Court "reaffirms the proper interpretation or application of existing law and brings [an] erring circuit or circuits into line with the correct view of the law, the Court has not necessarily created new [and non-retroactive] law"). Pinchon's argument regarding the district court's reliance on *Mayle* is therefore without merit.

Nor did the district court err in applying *Mayle*'s analysis to the facts of the present case. Pinchon's claims set forth in his original petition related to the sufficiency of the evidence at trial and to one of the trial court's jury instructions regarding his sentence. These claims do not share a "common core of operative facts" with Pinchon's ineffective-assistance-of-counsel claims, which involve his transfer hearing in the juvenile court and his trial attorney's failure to present certain evidence about Pinchon's mental retardation, about Handy, and about Graham. *See Mayle*, 545 U.S. at 664. We therefore find no error in the district court's conclusion that Pinchon's amended petition was untimely because his ineffective-assistance-of-counsel claims do not relate back to his original petition.

### 2.      *Procedural default*

Pinchon also challenges the district court's conclusion that his ineffective-assistance-of-counsel-at-trial claim was procedurally defaulted.   But we need not consider this argument in light of our determination that Pinchon failed to timely raise the claim in the district court. *See Wilberger v. Carter*, 35 F. App'x 111, 112 (6th Cir. 2002) (declining to reach the procedural-default issue because the habeas petition "was filed beyond the one-year limitations period set by 28 U.S.C. § 2244(d)(1)").  We therefore decline to address whether the district court's procedural-default ruling was in error.

### D.      Sufficiency-of-the-evidence claim

Pinchon's final argument is that he is entitled to habeas relief because the evidence was insufficient to sustain his conviction.  A conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).   In a habeas proceeding, however, we cannot simply conduct a de novo review of the state court's application of that rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of AEDPA. *See Getsy v. Mitchell*, 495 F.3d 295, 315-16 (6th Cir. 2007) (en banc) ("Whether [the petitioner] is entitled to habeas relief ultimately depends on whether the [state court]'s denial was based on an unreasonable application of clearly established federal law regarding the sufficiency of the evidence.").

Our task in the present case is thus "to determine whether it was objectively unreasonable for the [state court] to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the [S]tate, could have found that [Pinchon] committed the essential elements of [the crime charged] beyond a reasonable doubt." *See Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007).  Pinchon can therefore be granted habeas relief only if the Tennessee Court of Criminal Appeals unreasonably applied the *Jackson* standard.

When reviewing whether the state court's determination was "objectively unreasonable," we engage in a two-step analysis.  First, we ask whether the evidence itself

was sufficient to convict under *Jackson*. The inquiry ends if we determine that there was sufficient evidence to convict Pinchon. But even if we were to reach the conclusion that the evidence was insufficient to convict, we would then have to apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding to the contrary. *Id.* The law therefore "commands deference at two levels." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

Pinchon argues that no reasonable juror could have concluded that he shot Handy as a premeditated and intentional act because no eyewitness testified at trial. The State instead relied on the testimony of Mary Jones, Handy's next-door neighbor, who was in her house when Handy was killed. *State v. Pinchon*, No. M1999-00994-CCA-R3-CD, 2000 WL 284071, at *1-*2 (Tenn. Crim. App. Mar. 17, 2000). Jones testified that she had witnessed an altercation between Pinchon and Handy three or four days before the shooting, saw Pinchon threaten Handy in the hours leading up to the shooting, saw Pinchon enter Handy's residence just before the shooting occurred, and saw Pinchon pull a .22-caliber pistol—the same type of gun used to kill Handy—from his pants when he entered Handy's home. *Id.*

This evidence is sufficient to sustain Pinchon's conviction. As the Tennessee Court of Criminal Appeals concluded,

> [t]he evidence, even though circumstantial, supports the verdict in this case. It reflects that some disaffection was afoot between the parties, that the defendant threatened to kill the victim, and that moments before the fatal shot was fired the defendant displayed a gun of the same caliber that killed the victim.
>
> Without question, the weight of the state's case rests upon the testimony of Mary Jones. In the defendant's brief, he complains that Jones's testimony was not corroborated. However, the testimony of a non-accomplice witness need not be corroborated. Jones's testimony, if believed, established circumstantially the elements of first degree murder, and the jury obviously accredited her testimony and gave it much weight, as was their prerogative. As explained above, on appeal we do not reweigh the evidence nor make assessments of witness credibility. We do not substitute evidentiary inferences for those reached by the jury. The reconciliation of conflicts of facts in evidence is a matter entrusted exclusively to the jury as trier of fact. In this case, the jury has resolved the conflicts in favor of the state's theory, and we are powerless to interfere.

*Id.* at *4 (citations omitted).

Pinchon has not shown that the jury's verdict was an unreasonable determination in light of the evidence presented at trial, nor has he demonstrated that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. We therefore find no error in the district court's denial of habeas relief regarding Pinchon's sufficiency-of-the-evidence claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

————————————

**CONCURRENCE**

————————————

COLE, Circuit Judge, concurring.  I concur in the majority's opinion, but write separately to express my distress over the harsh edges of AEDPA and our habeas jurisprudence, displayed so dramatically in this case.

Edward Pinchon is serving a life prison sentence for the murder of Leslie Handy. At the time of the murder, Pinchon and Handy were carrying on a sexual relationship, even though Handy was in his mid-forties, and Pinchon was seventeen years old and mildly mentally retarded.

At the state post-conviction hearing, an academic counselor at Pinchon's correctional facility testified that Pinchon "had consistently tested lower than the fifth grade level in reading ability, which meant his reading ability was 'very limited.'" *Pinchon v. State*, No. M2003-00816-CCA-R3-PC, 2004 WL 193055, at *2 (Tenn. Crim. App. Jan. 28, 2004).  He believed that Pinchon's "ability to read and follow instructions with respect to meeting a deadline would depend on how complicated the instructions were and whether the vocabulary was beyond his comprehension." *Id.*  Further, Dr. Lynn McRainey, a school psychologist and psychological examiner who interviewed and tested Pinchon and reviewed his psychological records dating back to when he was in kindergarten, testified that "she determined that [Pinchon] had a full scale IQ score of 67, 'which falls in the range of mild mental retardation.'" *Id.*  She noted that Pinchon "ha[d] a history of being certified as language impaired," and that she believed his IQ always had fallen within a range of 64 to 71. *Id.*  In her opinion, he was "unable to plan ahead to meet a deadline." *Id.*

Despite his intellectual deficiencies, Pinchon's case was transferred from juvenile to criminal court, where he was tried as an adult and convicted.  Pinchon appealed his conviction, and the Tennessee Court of Criminal Appeals affirmed.  He appealed that decision, but the Tennessee Supreme Court denied Pinchon leave to appeal on December 11, 2000.

Within three months of this denial, Pinchon instituted this habeas petition in federal district court, but did not plead an ineffective-assistance-of-counsel claim. Apparently unclear about the status of his state appeal, Pinchon wrote to the Tennessee Supreme Court in September 2001 asking for information on "the status of [his] pending Motion to Reconsider." (Pinchon app. 557.) What he received in response was a handwritten note stating: "On 12/29/00, the case was mandated (closed) & jurisdiction was returned to the trial court. Nothing currently pending because the case is closed." (*Id.*) Pinchon, with no counsel and only the help of a fellow inmate in the prison library, filed his state petition for post-conviction relief on December 28, 2001, which included his ineffective-assistance-of-counsel claims. It appears as though Pinchon thought that December 29, 2000, the date referenced in the handwritten note, was the "the date of the final action of the highest state appellate court." *See* Tenn. Code Ann. § 40-30-102(a). Pinchon was mistaken. The statute actually refers to the date Pinchon's petition for leave to appeal was denied, December 11, 2000. Thus, his petition was filed seventeen days late. This mistake, made by an incarcerated young man with the reading skills of a fifth-grader and no legal counsel, together with habeas counsel's failure to pursue an amendment on a timely basis, cost him his right ever to have any court hear the substance of his claim that he was denied effective assistance of counsel.

In this case, procedural bars have conspired to keep any court from determining whether Pinchon was denied his right to effective counsel, despite the fact that, in my opinion, Pinchon diligently pursued his post-conviction legal remedies both in state and federal court. Pinchon filed his original federal habeas petition several days *before* the AEDPA statute of limitations *began* to run. He pursued his claims of ineffective assistance of counsel in state court within twelve months of his case being mandated by the state appellate court. However, the state courts declined to hear these claims on the merits because his petition was filed seventeen days late, notwithstanding the fact that his lateness appears to be attributable to his receipt of the opaque, handwritten note from the state court and his misreading of a statute that any layperson—let alone an incarcerated, mentally retarded, lay person—easily could misread. This Court is unable to hear these claims on the merits because, under Supreme Court precedent, their factual bases are deemed not

sufficiently similar to the factual bases of the claims he pleaded in his original habeas petition to excuse the lateness of his amended petition.

It is disheartening and frustrating to acknowledge that the ability to pursue one's constitutional rights—with a life prison sentence hanging in the balance—can turn on such minor distinctions and such a small, understandable mistake made by an incarcerated, mentally retarded, young man with no attorney. Indeed, although these doctrines are grounded in the valid policy interests of efficiency and finality, this decision does not satisfy these interests. Rather than avoiding repetitive, time-consuming litigation, the application of these doctrines has resulted in years of litigation on procedural issues rather than the substance of Pinchon's claims. I believe that Pinchon's petition unjustly has been lost in the "Byzantine morass of arbitrary, unnecessary, and unjustifiable impediments" present in our habeas system. *Coleman v. Thompson*, 501 U.S. 722, 759 (1990) (Blackmun, J., dissenting). I concur in the judgment only because my misgivings about the outcome of this case "do[] not . . . justify a refusal to respect precedents that remain a part of our law." *Baze v. Rees*, 553 U.S. 35, 87 (2008) (Stevens, J., concurring in the judgment).