RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

TYSON O'NEAL,

*Petitioner-Appellee*,

*v.*

ERICK BALCARCEL, Warden,

*Respondent-Appellant*.

⎫
⎪
⎪
⎬  No. 18-2201
⎪
⎪
⎭

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:06-cv-12307—Avern Cohn, District Judge.

Argued:  June 20, 2019

Decided and Filed:  August 7, 2019

Before:  BOGGS, MOORE, and STRANCH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Benton C. Martin, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee.  **ON BRIEF:**  Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Benton C. Martin, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee.

─────────────

## OPINION

─────────────

KAREN NELSON MOORE, Circuit Judge.  The warden appeals the district court's grant of Appellee Tyson O'Neal's application for a writ of habeas corpus under 28 U.S.C. § 2254.

O'Neal was convicted in Michigan state court of the second-degree murder of Gene Shelby, who was shot at a gas station. At trial, O'Neal argued that Parish Hickman, not O'Neal, had shot Shelby. Over O'Neal's objections, the trial court excluded two statements that would have supported this defense theory: (1) a jailhouse confession that Hickman allegedly made to another inmate, claiming that Hickman had gotten away with shooting Shelby and was going to blame O'Neal, and (2) a statement that Shelby made to a police officer at the hospital where he died, identifying Hickman as the shooter. The statement was also overheard by a nurse.

On appeal, the warden concedes that the trial court's exclusion of these statements violated O'Neal's right to present a complete defense under *Chambers v. Mississippi*, 410 U.S. 284 (1973). Yet, the warden argues that the Michigan Court of Appeals reasonably determined that the erroneous exclusion of the statements was harmless. We affirm the district court's grant of O'Neal's § 2254 application.

## I. BACKGROUND

On January 23, 2001, Gene Shelby, a member of the Sons of Zodiac Motorcycle Club, and three other club members were at a gas station in Detroit when they observed Parish Hickman pull into the gas station. Shelby and Hickman had previously had a dispute. Hickman soon left the gas station and went to a nearby home to retrieve mace. He returned to the gas station but then left again, driving to the same home to retrieve an AK-47. He then promptly traveled back to the gas station and called Shelby over to speak to him. The two quarreled, and Hickman returned to his car. Shots were then fired from the vicinity of Hickman's vehicle, hitting Shelby in the shoulder. Shelby's fellow motorcycle club member Shakir Azeem drove him to the hospital where Shelby eventually died of heart complications brought on by the gunshot.

Hickman fled the country soon after the shooting but returned about a year later and was arrested. He informed the police that Tyson O'Neal had been a passenger in his vehicle and had been the one to shoot Shelby. Hickman entered into a plea agreement, pleading guilty to manslaughter, which would carry a sentence of between three and fifteen years in prison, in exchange for his testimony at O'Neal's murder trial.

At O'Neal's trial, Hickman testified that he and O'Neal, who was allegedly high on heroin at the time, arrived at the gas station and saw that Shelby was there with members of his motorcycle gang. Hickman claimed that he was frightened because Shelby was with a group and there was bad blood between Shelby and himself. Hickman testified to traveling to the same nearby house twice, first to retrieve mace and then to get an AK-47. He testified that he returned to the gas station and left the gun in the car with O'Neal when he got out to confront Shelby. Hickman testified that he challenged Shelby to a fight, but Shelby did not engage. Hickman stated that he then walked back toward his car and told O'Neal to "handle [O'Neal's] business." R.14 (Trial Tr. at 43–44) (Page ID #674–75). According to Hickman, he was surprised when O'Neal then opened the passenger door, got out, and fired the AK-47 twice at Shelby. *Id.* at 44 (Page ID #675).

Four witnesses testified that the gunshots had come from the passenger side of Hickman's vehicle. Three of the four were members of Shelby's motorcycle club: Edward Clark, Henry Patterson, and Shakir Azeem. Clark testified that he saw O'Neal begin to emerge from the car with the AK-47, but that he sought cover when the shooting began and did not see whether O'Neal got all the way out of the car. R. 13-6 (Trial Test. at 260–63) (Page ID #434–37). Patterson testified that he saw O'Neal begin to emerge from the passenger side of the car with a rifle, but that he began to run and did not see O'Neal fire shots. R. 13-6 (Trial Tr. at 296) (Page ID #470). Azeem testified that he saw O'Neal emerge from the vehicle with the AK-47 but did not see the shots fired. R. 14-2 (Trial Tr. at 96–98) (Page ID #620–22); R. 14-3 (Trial Tr. at 101) (Page ID #525). Clark, Patterson, and Azeem all identified O'Neal as the shooter in a lineup conducted over a year after the shooting occurred. R. 13-6 (Trial Tr. at 267, 270, 299) (Page ID #441, 444, 473); R. 14-2 (Trial Tr. at 94–97) (Page ID #618–21). However, Patterson's lineup identification of O'Neal varied from Patterson's statement to Officer Curtis Johns shortly after the shooting. Officer Johns's report noted that Patterson had identified Hickman as the shooter. R. 15 (Trial Tr. at 8) (Page ID #719). Finally, at trial, Azeem testified that while he drove Shelby to the hospital, Shelby stated: "Parish [Hickman] has shot me." R. 14-3 (Trial Tr. at 104) (Page ID #528).

Twana Hickman, Hickman's estranged wife, testified that on the evening of the shooting, Hickman called her and asked her to pick him up at his sister's home. She testified that she picked Hickman and O'Neal up at Hickman's sister's home and took Hickman back to her own home where he spent some time before eventually leaving. R. 14 (Trial Test. at 21–28) (Page ID #652–59).

The other witness, Dorshell Wilkerson, the only one who was unaffiliated with any of the involved parties, testified that she saw the passenger door of Hickman's vehicle open and saw someone with a gun emerge and begin to shoot. R. 13-5 (Trial Test. at 208, 216, 231–34) (Page ID #332, 340, 355–58). Wilkerson testified that she did not identify anyone in a lineup as the shooter.

O'Neal advanced a defense of actual innocence and argued that Hickman, the true shooter, had claimed that O'Neal had pulled the trigger in order to secure a plea deal. He stated that he had initially arrived at the gas station with Hickman, but that he had gone inside the gas station to buy cigarettes and play the lottery while Hickman pumped gas. O'Neal testified that he began talking with Denise Hicks, a friend of his fiancée, whom he encountered inside the gas station. He claimed that Hickman left the station, presumably to retrieve the gun, while O'Neal was still inside. According to O'Neal, as O'Neal was leaving the station, he observed that Hickman had returned. He testified that he saw Hickman with a gun in his hand, that he heard gunshots, and that he saw Hickman throw the gun to another unidentified man on the passenger side of the vehicle before the two drove away.

Denise Hicks testified at trial for the defense. She stated that she talked to O'Neal inside the gas station on the evening of the shooting and that they exited the gas station together. She testified that O'Neal was standing next to her when she saw a tall man with something in his hands in the parking lot and then heard gunshots. She claimed that she and O'Neal both dropped to the ground, but that when the shots ceased she ran to her car and O'Neal left in the other direction. Hicks admitted on cross-examination that although she knew that O'Neal was charged with murder, she had not contacted the police to share her story prior to testifying for the defense. R. 15 (Trial Tr. at 26–28) (Page ID #737–39).

Anita Robinson, O'Neal's fiancée, also testified on his behalf.  She stated that O'Neal called her in the early evening on the day of the shooting, and that she went to the gas station to pick him up, dropping him off at his mother's home.  R. 15 (Trial Tr. at 30–32) (Page ID #741–43).

The subject of the present appeal is the trial court's exclusion of two statements.  The first statement would have been admitted through the testimony of two people who were present at the hospital where Shelby was treated after the shooting:  a nurse named Earl Rupert and a police officer named Pride Johnson.  Officer Johnson would have testified that Shelby told him that Hickman shot him.  Nurse Rupert overheard this exchange and would have also testified to the statement.  R. 15-2 (Trial Tr. at 58–60) (Page ID #769–71).  The trial court prevented Johnson and Rupert from testifying, concluding that the statement did not fall under Michigan's catch-all exception to the hearsay rule because the fact that Shelby was likely medicated when he made the statement made it unreliable.  *Id.* at 59–60 (Page ID #770–71).

The second excluded statement was a jailhouse confession that Hickman allegedly made to another inmate named Deandre Wilson when both were incarcerated.  Wilson wrote a letter informing O'Neal's counsel of the conversation and eventually told a defense investigator that Hickman told him that Hickman had gotten away with shooting someone, received only three to fifteen years in prison for the shooting, and was going to put the whole case on O'Neal.  R. 14-2 (Trial Test. at 77–79) (Page ID #601–03).  The trial court prohibited the admission of the statement because it concluded that the prosecution had not been informed timely of it, pursuant to a discovery order (which did not actually exist).

The jury convicted O'Neal of second-degree murder, possession of a firearm during the commission of a felony, and possession of a firearm by a person convicted of a felony.  He was sentenced as a fourth habitual offender to thirty-six to eighty years for the murder, two years for the possession of the firearm during a felony, and twenty-eight months to five years for being a felon in possession of a firearm.  *People v. O'Neal*, No. 247133, 2004 WL 2072070, *1 (Mich. Ct. App. Sept. 16, 2004).

O'Neal appealed his conviction to the Michigan Court of Appeals. He claimed, among other things, that the exclusion of the two statements violated his Fourteenth Amendment due-process right. The Michigan Court of Appeals affirmed O'Neal's convictions. *Id.* With regard to the trial court's exclusion of Hickman's jailhouse confession, the Michigan Court of Appeals concluded that the exclusion was error, but held:

> Where four people testified that Hickman was on the driver's side of the car when the passenger emerged from the other side with a gun, and three people identified defendant as the passenger and shooter, we find beyond a reasonable doubt that a rational jury would have found defendant guilty even if defendant had been permitted to confront Hickman with the alleged statement. Thus, we find the exclusion of the statement harmless.

*Id.* at *1. With regard to the trial court's exclusion of Shelby's hospital identification of Hickman as the shooter, the Michigan Court of Appeals held that the trial court did not abuse its discretion:

> Because the victim had been shot and was likely medicated at the hospital, because four people testified at trial that Hickman was on the driver's side of the car when the passenger door opened and the passenger emerged with a gun, and because three people identified defendant as the passenger and shooter, we conclude that the trial court was justified in concluding that Shelby's statement was untrustworthy.

*Id.* at *2.

O'Neal then filed an application for leave to appeal in the Michigan Supreme Court, advancing the same claims. The Michigan Supreme Court denied this application. *People v. Tyson O'Neal*, 697 N.W.2d 153 (Mich. 2005).

O'Neal next filed an application under 28 U.S.C. § 2254 in the federal district court for the Eastern District of Michigan, raising the same issues. He moved to stay the case so that he could advance additional claims in state court. The federal district court granted that motion. O'Neal then filed a motion for relief from judgment in the state trial court, raising other claims, which the trial court denied, save addressing one technical error. O'Neal filed an application for leave to appeal in the Michigan Court of Appeals, which was denied, and an application for leave to appeal in the Michigan Supreme Court, which was also denied, save for dealing with the

technical error previously mentioned.  O'Neal then returned to federal district court, which lifted the stay on his earlier filed § 2254 application and directed the warden to file an answer and supplemental state-court record.  *See* R. 28 (June 30, 2015 Order).  The warden filed an answer and O'Neal replied.

On the merits, the district court held that the trial court's exclusion of the two statements had violated O'Neal's right to present a complete defense and concluded that the state court unreasonably applied *Chambers v. Mississippi* in denying O'Neal's claims.  R. 34 (Mem. and Order Granting Conditional Writ of Habeas Corpus at 14) (Page ID #1408).

In analyzing whether the *Chambers* errors were harmless, the district court distinguished between the exclusion of Hickman's jailhouse confession and that of Shelby's hospital identification.  It concluded, based on its reading of *Langford v. Warden* (*Langford II*), 665 F. App'x 388 (6th Cir. 2016), that because the Michigan Court of Appeals had conducted harmless-error analysis regarding the jailhouse confession but not the hospital statement, it was required to apply "a heightened degree of deference" only to the Michigan Court of Appeals' harmless-error treatment of the jailhouse confession.  R. 34 (Mem. and Order Granting Conditional Writ of Habeas Corpus at 19) (Page ID #1413) (quoting *Langford II*, 665 F. App'x at 389).  The district court, however, ultimately concluded, in the language of the standard in *Brecht v. Abramson*, 507 U.S. 619, 637 (1993), that it had "grave doubt" about whether the exclusion of *each* statement "had substantial and injurious effect or influence in determining the jury's verdict."  R. 34 (Mem. and Order Granting Conditional Writ of Habeas Corpus at 21–22) (Page ID #1415–16) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  It therefore granted O'Neal's habeas corpus application.  The warden appealed.

## II.  DISCUSSION

### A.  Standard of review

We review "de novo a district court's decision to grant or deny a petition for a writ of habeas corpus."  *Pinchon v. Myers*, 615 F.3d 631, 638 (6th Cir. 2010) (quoting *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006)).  On appeal, the warden concedes that the Michigan trial court's exclusion of the hospital and jailhouse statements amounted to violations of O'Neal's

constitutional right to present a complete defense under *Chambers.* Appellant Br. at 3, 13; Appellant Reply Br. at 1. The case before us, therefore, focuses solely on whether those errors were harmless.

## B. *Brecht* and AEDPA

Depending on the procedural stage of a criminal defendant's challenge to his conviction, different harmless-error tests apply. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015). On direct appeal in state courts, the harmlessness formulation of *Chapman v. California*, 386 U.S. 18 (1967), governs and constitutional error is harmless only if the court can "declare a belief that [the error] was harmless beyond a reasonable doubt." *Id.* at 24. Yet, the harmless-error standard demands more of a habeas petitioner when a federal court reviews the conviction in a collateral proceeding. In federal habeas proceedings, the *Brecht* standard governs and the federal court will not grant habeas relief unless the state error "resulted in 'actual prejudice.'" *Ayala*, 135 S. Ct. at 2197 (quoting *Brecht*, 507 U.S. at 637). This means that in order to grant habeas relief, the court must have at least "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quoting *Brecht*, 507 U.S. at 627). "[G]rave doubt" about whether the error was harmless means that "the matter is so evenly balanced that [the court] feels [it]self in virtual equipoise as to the harmlessness of the error." *Id.* at 435.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs federal courts' ability to grant habeas relief to a state prisoner whose claim "was adjudicated on the merits in State court." 28 U.S.C. § 2254(d). Under AEDPA, a federal court may grant habeas relief only if the state-court adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* "[T]o be deemed an 'unreasonable application of . . . clearly established Federal law,' a state-court decision on the merits must be 'objectively unreasonable,' not simply erroneous or incorrect." *Fleming v. Metrish*, 556 F.3d 520, 525 (6th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 409–11 (2000)). State courts' harmless-error

determinations are adjudications on the merits, and therefore federal courts may grant habeas relief only where those determinations are objectively unreasonable. *Ayala*, 135 S. Ct. at 2198–99.

In *Fry v. Pliler*, 551 U.S. 112 (2007), the Supreme Court explained the relationship between the *Brecht* standard and AEDPA in reviewing state courts' harmless-error determinations, stating that because the *Brecht* standard "obviously subsumes" the "more liberal AEDPA/*Chapman* standard," federal courts need not "formal[ly] appl[y] *both* tests." *Id.* at 120. In *Ayala*, the Supreme Court reiterated *Fry*'s explanation that "if the state court adjudicated [a petitioner's] claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA," and went on to analyze both whether the petitioner had "establishe[d] actual prejudice or that no fairminded jurist could agree with the state court's application of *Chapman*." *Ayala*, 135 S. Ct. at 2199, 2203. The Court answered both questions in the negative. *Id.* at 2208.

In *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009), we interpreted *Fry* and stated: "In this Circuit, *Brecht* is the standard for reviewing all (non-structural) errors on collateral review." *Id.* at 411. This was the case because "the determination of whether an error had a 'substantially injurious' effect on the jury's verdict is broader and thus 'subsumes' the question whether the state court reasonably applied *Chapman*." *Id.* at 412. We also explicitly acknowledged that in some situations "it is ambiguous if [the state court] performed [harmless error] review at all," and held that even in such circumstances "*Brecht* is always the test." *Id.* at 411–12. *Ayala*'s clarifications and its application of the AEDPA/*Chapman* test have not altered our analysis in *Ruelas*. *See McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015) (citing *Ruelas* and applying *Brecht* universally post-*Ayala*); *Sheard v. Klee*, 692 F. App'x 780, 786 (6th Cir. 2017) (concluding that the *Brecht* standard necessarily could not be met where AEDPA/*Chapman* was not); *see also Langford II*, 665 F. App'x at 389 (on post-*Ayala* remand from the Supreme Court applying *Brecht* where the state court had not conducted harmless-error analysis).

The parties neglected to discuss *Ruelas* and *McCarley* and their embrace of *Brecht* across the board both pre- and post-*Ayala* in their briefing or at oral argument. Instead, much of their argument focused on whether the Michigan Court of Appeals had in fact made harmless-error

determinations and whether *Ayala* meant that those determinations were themselves specifically entitled to deference, with the warden arguing that we should apply the AEDPA/*Chapman* formulation to analyze the state court's harmless-error determinations. *See, e.g.*, Appellant Br. at 17, 21–23; Appellant Reply Br. at 6. *Ruelas*, which has not been affected by *Ayala*, obviates much of the parties' argument, however, by clearly announcing that in the Sixth Circuit on habeas review we always apply *Brecht* and need not also apply AEDPA/*Chapman*. We therefore turn to analyzing the effects of excluding the two contested statements under *Brecht*.

### 1. Hickman's jailhouse confession

We are left with "grave doubt about whether [the exclusion of the jailhouse statement] had 'substantial and injurious effect or influence in determining the jury's verdict.'" *McAninch*, 513 U.S. at 436 (quoting *Brecht*, 507 U.S. at 627). Given the considerable evidence indicating that Hickman, not O'Neal, was the shooter, we find it highly plausible that Hickman's jailhouse confession would have introduced a reasonable doubt into the jury's mind as to O'Neal's guilt and led to a different trial outcome.

First, as the Supreme Court has stated, "[a] confession is like no other evidence" in that it is among "the most probative and damaging" types of evidence because it "come[s] from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (second and third quotes quoting *Bruton v. United States*, 391 U.S. 123, 139–40 (1968) (White, J., dissenting)). In *Fulminante*, the Supreme Court noted the "profound impact" of a confession on a jury and concluded that the admission of the defendant's confession in that case could not be called harmless error. *Id.* at 296, 302. The nature of Hickman's jailhouse confession and its special ability to impact the jury contributes to our grave doubt as to whether allowing it would have altered the verdict.

Second, this is not a case in which the confession would have been the sole piece of evidence undermining the defendant's guilt or pointing toward another individual as the culprit. Rather, the defense had already laid out a plausible alternative narrative of the crime in which Hickman, not O'Neal, was the shooter. A survey of the evidence suggesting Hickman's guilt supports the conclusion that the admission of his jailhouse confession very well could have

introduced a reasonable doubt of O'Neal's guilt into the jury's mind. First, the entire theory of O'Neal's defense was that Hickman, not O'Neal, had shot Shelby, and Hickman's jailhouse confession to shooting Shelby and putting the crime on O'Neal would have perfectly aligned with this theory. Considerable evidence, both direct and circumstantial, already supported O'Neal's defense. O'Neal testified that he saw Hickman with the gun in his hands and heard shots. Denise Hicks testified that O'Neal was not the shooter and that she was standing next to O'Neal when they heard shots fired and dropped to the ground. Officer Johns's report, created soon after the shooting, stated that Patterson had informed him that Hickman was the shooter. Shelby, the victim himself, told Azeem that Hickman, not O'Neal, had shot him as they drove to the hospital. Azeem, Patterson, and Clark identified O'Neal in the lineup long after the shooting occurred and after having ample opportunity to speak to one another. Hickman had a motive to shoot Shelby: the two had previously had a dispute and there was bad blood between them. Hickman was admittedly at the gas station and in the vicinity of the car from which the shots were fired. Hickman admitted at trial that, when he encountered Shelby at the gas station, he left the gas station to retrieve an AK-47 and then returned to the gas station to confront Shelby, initiating an argument. Hickman fled the country after the incident and did not return for around a year. He benefited considerably from testifying that O'Neal had been the shooter—it facilitated his plea deal with the prosecution in which he received three to fifteen years in jail. In contrast, O'Neal, who was convicted of being the shooter, received thirty-six to eighty years in jail for the murder alone.

The warden argues that the error was harmless because O'Neal's counsel was able effectively to cross-examine Hickman even without the jailhouse confession. O'Neal's counsel suggested on cross-examination that Hickman had confessed to O'Neal's mother that he was the shooter, which Hickman denied. R. 14-2 (Trial Tr. at 74) (Page ID #598). O'Neal's counsel also suggested that Hickman had pleaded guilty to a lesser charge and testified against O'Neal to avoid a murder conviction himself. *See* R. 14-2 (Trial Tr. at 61–62, 68) (Page ID #585–86, 592). The warden argues that this cross-examination technique served the same purpose as use of the jailhouse confession to Wilson would have and therefore that its exclusion was harmless error. These cross-examination and impeachment techniques, however, could have been reinforced and strengthened had O'Neal's counsel been able to make use of Hickman's jailhouse statement.

Furthermore, the jury may have found that Wilson's lack of affiliation with the case and his having taken the initiative to reach out to O'Neal's counsel to disclose the statement increased its credibility. Unlike O'Neal's mother, Wilson had no loyalty to O'Neal and therefore no clear incentive to fabricate Hickman's self-incriminating statement. And unlike jailhouse informants who sometimes receive reduced sentences or other benefits in exchange for testifying on behalf of the government, Wilson stood to gain nothing from testifying on behalf of O'Neal. The fact that O'Neal's counsel already cross-examined Hickman does not preclude the possibility that the addition of impeachment based on Hickman's statement to Wilson would have changed the jury's verdict.

The confession very well could have been the straw that broke the camel's back in establishing a reasonable doubt as to O'Neal's guilt. *See Hawkins v. United States*, 358 U.S. 74, 80 (1958) (declining to find an error harmless even though it was "in part cumulative" when it pertained to an "issue of fact which, on the evidence in the record, the jury could have resolved either way depending largely on" which party it believed); *Krulewitch v. United States*, 336 U.S. 440, 444–45 (1949) (declining to find the erroneous introduction of a hearsay statement harmless where it could have been "the weight that tipped the scales against petitioner"). We therefore conclude that the district court properly granted habeas relief based on the exclusion of the jailhouse statement because of its potential profound impact on jurors, particularly when added to the already considerable admitted evidence indicating that Hickman, not O'Neal, was the shooter.

## 2. Shelby's hospital identification of Hickman as the shooter

We are also left with "grave doubt about whether" the exclusion of Shelby's identification of Hickman as the shooter to the police officer, overheard by the nurse, "had 'substantial and injurious effect or influence in determining the jury's verdict.'" *McAninch*, 513 U.S. at 436 (quoting *Brecht*, 507 U.S. at 627).

The warden argues that this error was harmless under *Brecht* because at trial, Azeem already testified that while he drove the injured Shelby to the hospital, Shelby identified Hickman, not O'Neal, as the shooter. The warden therefore posits that testimony to the same

effect by the nurse and police officer would have been cumulative and would not have made an appreciable difference in the jury's deliberations. *See* Appellant Reply Br. at 12.

We reject this argument for several reasons. First, testimony that mirrors the content of other testimony presented at trial can still have considerable impact by bolstering the credibility of the other testimony. *See Fulminante*, 499 U.S. at 299 (concluding that the erroneous admission of one confession was not harmless error even where a second confession had been admitted because "it is clear that the jury might have believed that the two confessions reinforced and corroborated each other"). The warden clearly appreciates the power of repetitive or mutually-reinforcing testimony; his briefs repeatedly emphasize the fact that *multiple* witnesses testified that the shots were fired from the passenger side of the vehicle. Second, the jury likely would have found the witnesses who were prevented from testifying about Shelby's statement at the hospital to be more credible than Azeem. Azeem was a member of a motorcycle gang. The witnesses whose testimony was excluded were a nurse and a police officer. Third, although the content of the statements Shelby made to Azeem in the car and to the police officer at the hospital was the same—that Hickman had shot Shelby—they were made at different points in time. That Shelby maintained that Hickman was the shooter over time and asserted it to different individuals, both his friend and unaffiliated professionals, increases his credibility.

As discussed above, this is not a case in which Shelby's hospital identification of Hickman as the shooter, if admitted, would have served as the sole piece of evidence indicating that someone other than the defendant committed the crime. Had the hospital identification been admitted, it would have joined an impressive array of evidence that would support the conclusion that Hickman, not O'Neal, was the shooter. O'Neal had only to create a reasonable doubt about his guilt in the jury's mind. This mass of evidence pointing to Hickman likely already did much of the work. We are left with grave doubt about whether the exclusion of Shelby's second identification of Hickman had "substantial and injurious effect or influence in determining the jury's verdict." *McAninch*, 513 U.S. at 436 (quoting *Brecht*, 507 U.S. at 627). Its admission very well could have pushed the jury over the edge, instilling a reasonable doubt about O'Neal's guilt. Accordingly, we conclude that the exclusion of the hospital identification was not harmless error under *Brecht*.

**3. Structural error**

O'Neal argues that the state trial court's violation of his right to present a complete defense by refusing to admit the two statements was a structural error under *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), and therefore is subject to automatic reversal rather than harmless-error analysis. Appellee Br. at 30–33. Our conclusions that the exclusion of the two statements "resulted in 'actual prejudice'" mean that we need not consider his argument that a violation of the right to present a complete defense could be a structural error requiring automatic reversal. *Ayala*, 135 S. Ct. at 2197 (quoting *Brecht*, 507 U.S. at 637).

## III. CONCLUSION

For the reasons set forth above, we affirm the district court's conditional grant of O'Neal's application for a writ of habeas corpus providing that unless a new trial is scheduled within 120 days, O'Neal must be unconditionally released.