RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

WILBERN WOODROW COOPER,

>  *Petitioner-Appellant,*

*v.*

> No. 18-1391

WILLIS CHAPMAN, Warden,

>  *Respondent-Appellee.*

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-10679—Sean F. Cox, District Judge.

Argued:  April 16, 2020

Decided and Filed:  August 17, 2020

Before:  MOORE, KETHLEDGE, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Amy C. Lishinski, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant.  John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  Amy C. Lishinski, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant.  John S. Pallas, Kathryn M. Dalzell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  Wilbern Woodrow Cooper, Lapeer, Michigan, pro se.

BUSH, J., delivered the opinion of the court in which KETHLEDGE, J., joined. MOORE, J. (pp. 19–26), delivered a separate dissenting opinion.

_____

**OPINION**

_____

JOHN K. BUSH, Circuit Judge.   Wilbern Woodrow Cooper petitioned for habeas corpus on the ground that his first-degree felony murder conviction in Michigan state court violated *Miranda v. Arizona*, 384 U.S. 436 (1966).   He contends that a custodial confession he gave in 2010 to the 1978 murder of David McKillop should have been excluded from evidence.   We hold that the district court properly denied habeas relief because the Michigan trial court's admission of the confession was not an error that rose to the level of actual prejudice.   We therefore **AFFIRM** the district court's denial of Cooper's habeas petition.

**I.**

**A.  The Murder of David McKillop**

In September 1978, twenty-two-year-old David McKillop was brutally murdered in Farmington Hills, Michigan.   Officers discovered McKillop's body with his hands bound behind his back by an electrical cord and with seven gunshot wounds to his head.

For twenty-eight years McKillop's family had no answer as to who had murdered David. This changed in 2006, when Billy Joe Lolley, McKillop's former real estate agent and neighbor, came forward to the police with a valuable clue.   Lolley believed he was terminally ill and wanted to clear his conscience.

Lolley had known Cooper in 1978 both as a neighbor and also through a mutual acquaintance, Donny McKitty.   (R. 5.19; 5/9/12 Pros. Br. Mich. Ct. App.; Page ID 1186.) According to Lolley, Cooper was known by the nickname "Boo Boo" and was involved with a local gang-affiliated businessman, John Anderson.   (*Id*., Page ID 1186-87.)   Lolley was not part of the gang, but "just liked to party" with them on occasion.   (*Id*., Page ID 1191.)   Lolley also had known McKillop, who had been the real estate agent for Lolley and his wife. (*Id*., Page ID 1220.)   Most critically relevant, Lolley revealed that back in 1978 Cooper had approached him with a proposal.   According to Lolley, Cooper said that he had been paid $3,000 to kill someone,

and he in turn offered Lolley $1,500 to be his driver when Cooper made the hit. (5/5/11 Tr., R. 5.13, Page ID 766-67, 769). Lolley told the officers that he had declined Cooper's offer because he thought Cooper was kidding. (*Id.*, Page ID 766, 774).

But it was no joke. Cooper later told Lolley that he had, in fact, killed someone. Cooper shared chilling details, according to Lolley, which included McKillop's being tied up, forced to lie on the floor with a pillow over his head, and then being shot six to nine times in the head. (*Id.*, Page ID 766-67, 769.). But it was all for naught. Lolley claimed that Cooper had said he had mistakenly killed the wrong person. The real target of the crime was not McKillop, but rather McKillop's roommate, Paul Jenkins, because he owed money to Anderson. (*Id.*, Page Id 768.). *Accord People v. Cooper*, No. 304620, 2013 Wl 2223896, at *1 (Mich. Ct. App. May 21, 2013). At the time, Jenkins's business, Landmark Realty, was struggling with debts. (R. 5-19; 5/9/12 Pros. Br. Mich. Ct. App.; Page ID 1186.) Jenkins knew Anderson. However, at trial, Mr. Jenkins denied that he had owed Anderson—or anybody—any money related to Landmark, and he denied that he had dealt drugs through or with Anderson. (*Id.*, n. 4., 5.) Jenkins also claimed that people who had rented property from him had owed him money. (*Id.*, n. 4) However, Ms. Frazer, another witness who knew Jenkins, contradicted his statements. She claimed that in September 1978, Jenkins was worried about paying money back to "a loan shark or something." But Jenkins denied that he had ever told Frazer that he owed somebody a lot of money, and he denied that he had dealt drugs through or with Anderson. (*Id.*, n. 5.)

## B. Non-Custodial Interviews

### 1. December 2006 Interview

After Lolley came forward, police reopened the investigation of McKillop's death and reached out to Cooper in December 2006 for questioning. He agreed to be interviewed at the Bay City police station, where he met with Detectives Richard Wehby and Mark Haro. (5/5/11 Tr. R. 5.13, PageID 796.)

At the beginning of questioning, Wehby and Haro informed Cooper that he was not under arrest, and therefore he could leave at any time. (*Id.*, PageID 796-97; 5/6/11 R. 5.14, PageID 817). What the detectives did not reveal to Cooper, however, was the nature of the investigation.

Without these details on hand, Cooper was friendly and talkative.  (5/5/11 Tr., R. 5.13, Page ID 797-98).   He explained to the investigators that during the 1970s, he lived in Anderson's basement and that his landlord sold stolen property and facilitated narcotics transactions.  (*Id.*) According to Cooper, he would "never refuse a request" from Anderson (*id.*, Page ID  801), whether it be to break into houses or do "whatever" he was asked to do.  As Cooper explained, "he was trying to prove himself[.]"  (*Id.*, Page ID  798-99, 801).   However, as Cooper further explained, his behavior changed following several events in his life, which served as an "eye opener" that he would need to alter his lifestyle.  (*Id.*, Page ID 799-800.)   Cooper did so, he claimed, by joining the military and becoming "an assassin."  (*Id.*, Page ID 799-800; 5/6/11 Tr. R. 5.14, Page ID  819.)

At this point in the interview, Detective Wehby asked Cooper directly if he had ever killed anyone.  Suddenly, Cooper became far less talkative.  He seemed evasive and answered tersely that he had not killed for money. (5/5/11 Tr., R. 5.13, Page ID  803; 5/6/11 Tr., R. 5.14, Page ID  819.)  He added that he had never held anyone down to be beaten up or killed.  (5/5/11 Tr., R. 5.13, Page ID 803.)

The detectives then referenced Jenkins and McKillop, and the interview took a sudden turn.  Cooper's demeanor seemed to change, according to police testimony.  He suddenly sat up in his chair.  His skin now was flushed, and he appeared nervous.  (*Id.*, Page ID  800).  Detective Wehby informed Cooper that police had information that he was responsible for the homicide and had been paid to kill someone, but he had accidentally killed the wrong person.  (*Id.*, Page ID 801, 803).  According to Wehby's testimony, Cooper "never denied" these accusations, but rather simply "kept deflecting" the statements, saying "oh I don't recall that," and  "I wouldn't have had anything to do with that."   Based on these noticeable dodges, it appeared to the detectives as if Cooper was trying to change the subject.  (*Id.*, Page ID 801).  Then, for the first time in the interview, Cooper indicated he had had a "falling out" with Anderson and Anderson's affiliates.  He also began to speak negatively about the group, seeming to imply that its members were trying to pin the murder on him.  (*Id.*, Page ID 803).

Following this exchange Cooper refused to provide a DNA sample, even though he had initially agreed to do so.  (*Id.*, Page ID 801.).  According to Detective Wehby, Cooper also

appeared to be taking deliberate measures to avoid leaving DNA evidence.  He put his used cigarette stub in his shirt pocket after each smoke break. (*Id.*, Page ID 801-02.)  He broke up his Styrofoam cup and placed the pieces in his pockets. (*Id.*)  He also put into his pockets the paper towels he had used during bathroom breaks.  (*Id.*)

As the interview ended Cooper informed Detective Wehby that if it was the wrong guy who got killed, Cooper felt truly and deeply sorry for the victim's family; however, Cooper added that if it was the right guy, then that guy got what he deserved. (*Id.*, 5/6/11 Tr., R. 5.14, Page ID 820.)

### 2.  January 2010 Interview

In January 2010, Cooper agreed to take part in another interview with the police.[1] (5/5/11 Tr., R. 5.13, Page ID 804; 5/6/11 Tr., R. 5.14, Page ID 819-20.)  During this questioning Cooper inquired about both the availability of immunity from prosecution in exchange for his cooperation and the application of the Sentencing Guidelines. (5/5/11 Tr., R. 5.13, Page ID 804.)  He also told detectives: "I can't say anything right now because if I say anything right now I know you'll have to arrest me on the spot."  (*Id.*)  Later in the interview, the detectives told Cooper that they believed he had committed the murder.  To this, Cooper responded, "hypothetically let's say [Anderson] . . . put me up to this.  I broke into the house.  I shoot the guy, is that what you're saying?"  When Detective Wehby answered "[y]es," Cooper reportedly "just smiled."  (*Id.*, Page ID 805).  However, he did not make any denials of his involvement.  Subsequently, though, Cooper asked the detective if they had identified a gun from the murder.  When the detectives responded no, Cooper stated: "well then all you got is circumstantial evidence."  (*Id.*, Page ID 805-06.)

Finally, Cooper informed police that he wished to end the interview, go home, and make preparations with his wife for what was coming, including transferring property into her name. (*Id.*, Page ID 806).  However, because the detective now had a warrant, prior to Cooper leaving,

---

[1]Detective Wehby testified that the three-year delay between the first and second custodial interviews was related to the detectives' information-gathering efforts and a change of administrations at the prosecutor's office. (5/9/11 TR., R. 5.15, Page ID 833).

they were able to collect a DNA sample from him.  They also advised him that he would be arrested at their next encounter.  (*Id.*; 5/6/11 Tr., R. 5.14, Page ID 820.)

## C.  Custodial Interviews

### 1.  First March 2, 2010 Interview

On March 2, 2020, Cooper was arrested in Bay City.  (5/5/11 TR., R. 5.13, Page ID 806; 5/6/11 Tr., R. 5.14, Page ID 820).  Detectives Wehby and Scott Rzeppa began Cooper's first custodial interview at approximately 5:10 pm that day (3/2/10 Tr., R. 1.5, Page ID 119.).[2]  They advised him of his constitutional rights, which he waived both verbally and in writing.  (5/5/11 Tr., R. 5.13, Page ID 807; Appellee's Br. appendices A and B, R. 5.19, Page ID 1226, 1228).  Thereafter, through the course of the interview, Cooper admitted to having gone with several other individuals on three occasions to the house where McKillop's murder had occurred.  The murder, according to Cooper, took place on the third occasion.  (3/2/10 Tr., R. 1.5, Page ID 123-24, 135, 143).

Cooper  explained that the objective of the visits was to encourage Jenkins to repay the money he owed to Anderson.  This was intended to be accomplished by tying Jenkins up and "maybe beat[ing] the shit out of him[.]"  (*Id.*, Page ID 123-25).  On the first two visits, Jenkins was not there.

Jenkins was not home during the third visit either, but unfortunately McKillop was.  During the murder Cooper claimed that he had remained outside on the front porch, serving as a lookout as his peers entered the house.  (*Id.*, Page ID 128).  According to Cooper he never entered the house.  He further claimed that, while on the porch, he had heard argument followed by gunfire from inside the home.  (*Id.*, Page ID 128-29).  A few days later, he learned that the victim had been the wrong person.  (*Id.*, Page ID 133)

The detectives were skeptical that Cooper had told them everything.  To "get him to admit his further involvement if he thought that we had some more information on him," the

---

[2]Cooper's first custodial interview was recorded and played for the jury in full.  (5/5/11 TR. R. 5.14, Page ID  806-07, 09; 5/6/1111 Tr. R. 5.14, Page ID  812, 820).

detectives raised the specter that Cooper's DNA may have been found on the victim. (5/6/11 Tr., R. 5.14, Page ID 821; 3/2/10 Tr., R. 1.5, Page ID 186-202). Cooper resisted this tactic, however, and insisted that he had stayed outside the house throughout the evening. (*Id.*) Approximately three hours into the interview, Cooper then expressed exasperation that the detectives did not believe his story: "See, that's why I don't want to talk to you guys about this because who do I have to collaborate [sic] anything I have to say?" (*Id.*, Page ID 193). Shortly afterwards, the interview ended.

### 2. Second March 2, 2010 Interview

Following the first interview on March 2, 2010, Cooper was transferred to the Farmington Hills Police Department, where at approximately 10:30 p.m. his second custodial interview began. The detectives started by asking if Cooper remembered the *Miranda* waiver form he had signed in Bay City, and advising him that it still covered their conversation. Cooper nodded affirmatively to both statements. (3/2/10 Tr., R. 5.18, Page ID 1032.) Then he was questioned, but he continued to deny shooting McKillop and reiterated the version of events that he had conveyed earlier in the day.

Approximately one hour into the interview, Detective Wehby once more referenced the topic of DNA, telling Cooper, "[l]et's get it out if we've go[t] to start giving explanations as to why those might be your hairs and those might be your DNA on the victim inside the house." (*Id.,* Page ID 1043.) Cooper pushed back against this line of questioning, though, and he continued to insist that he had not entered the house. (*Id*., Page ID 1044).

Shifting tactics, Wehby then hypothesized that Cooper had been inside the house when someone else unexpectedly pulled a gun. Cooper shook his head no. (*Id.*, Page ID 1047.) "Is that what happened?" Wehby asked. "No," answered Cooper. The suspect stood up, but Detective Rzeppa quickly ordered him to sit back down. Cooper then asked to be taken back to his cell and said that he needed to use the restroom. Wehby responded that there was not a restroom nearby and that "[i]f you don't wanna talk to us fine, we're gonna stare at you all night." Relenting, Cooper resumed discussion with the detectives.

Wehby now explained to Cooper that the evidence would look unfavorable at trial, unless "we get ahead of the curve, and we can admit[/]explain why your DNA or hair may possibly be on the victim or that cord then we can explain it." (*Id.*, Page ID 1049-50). Wehby suggested that Cooper could potentially be portrayed as the "fall guy," who just happened to be at the scene of the crime when someone else shot McKillop. (Id., Page ID 1049-50). At that point, Cooper stated, "I have nothing further to say," (*id.*), and when the detectives posed additional questions, he emphasized his refusal to speak more by thanking the detectives for their time and reiterating that he was "[n]ot talking anymore." (*Id.*, PageID 1051.) But, Wehby tried again to get Cooper to confess: "One more question, Wil[bern]. And we'll go to your cell. Did you shoot and kill this guy?" Cooper replied, "no." (*Id.*, Page ID 1052).

The interviewed ended at approximately 11:53 p.m. (*Id.*) At no point during the entire interview did Cooper invoke his right to counsel.

### 3.  March 3, 2010 Interview

At around 9 a.m. the next day, March 3, 2010, Cooper met with the detectives for his third custodial interview. (3/3/10 Tr. R. 1.6, Page ID 205, 205-07). Wehby again showed Cooper the *Miranda* form he had signed the previous day and asked if he remembered it. (*Id.*) Cooper responded affirmatively, and the detective said the form was "still in effect." (*Id.*)[3]

Wehby then pivoted to the main objective of the conversation: the investigators wanted to get Cooper's "story" a third time "to make sure that we got your story that you're sticking with. . . . OK? We want to make sure that we got, we got it down right. That we don't make any mistakes on your part . . . on your part or our part. Ok?" To this, Cooper replied: "Alright." (3/3/10 Tr., R. 1.6, Page ID 205-06). Then, after some small talk about the quality of the police department food, Cooper abruptly stated: "Alright, I guess I'm gonna try this." (*Id.*, Page ID 207.) At that point, he proceeded to discuss the McKillop murder with the detectives.

As Cooper launched into details of the story, he initially remained consistent in his explanation that he had stood on the front porch throughout the entirety of the shooting. (*Id.*,

---

[3]During trial, the prosecutor emphasized that the video footage from the third custodial interview reflects that Cooper looked at the form and nodded. (*See* Pros. Br., R. 5.19, Page ID 1214.)

Page ID 212.) But then, Wehby interrupted Cooper to explain the plausibility problems with that story. To this, Cooper replied: "I think I'm done talking at this time. I've got a lot to think about. I've gotta use the bathroom." ((*Id.*, Page ID 228.) Wehby responded, "that's fine and I understand that," though he reminded Cooper that his arraignment was in three hours. (*Id.*). Thereafter, the detectives asked Cooper what he wanted to do. (*Id.*) Cooper responded simply that he did not wish to "sit the rest of life in prison for something I didn't do." (*Id.*)

The conversation then took another shift, with discussion of Cooper's challenging upbringing and life circumstances, as well as the pain McKillop's family must have felt during the years when the investigation went cold. (*Id.*, Page ID 228-32). Cooper acknowledged this pain and lamented the situation. (*Id.*, Page ID 232). The discussion continued for a bit more, followed by a restroom break. (*Id.*, Page ID 236).

After questioning resumed the detectives told Cooper he could help himself and the victim's family by disclosing more about the crime. Cooper responded with, "I'm not saying anything," and "I'm not saying any more." (*Id.*, Page ID 245-48, 250.) But Wehby persisted, asking Cooper if he "want[ed] to talk about this anymore?" Cooper answered, "Not right now." (*Id.*, Page ID 245.) Wehby then reminded Cooper that time was running out, to which Cooper responded, "Yeah." (*Id.*) The questioning continued, with Cooper offering more answers to the officers. (*See id.*, Page ID 245-47.) However, when discussion veered back towards the events that took place on the night of McKillop's murder, Cooper again said, "I'm not saying anything." (*Id.*, Page ID 247-48).

Yet the meeting continued. Eventually Cooper admitted that he had witnessed McKillop's murder and that he knew who had tied him up and shot him, but denied that he was the one who had done it. (*Id.*, Page ID 248.) When asked who the murderer was, however, Cooper dodged the question, declaring: "I'm not saying no more." (*Id.*, Page ID 248, 250, 254.) Upon further discussion, Cooper suddenly appeared as if he had had enough of the interrogation. He accused the detectives of having already concluded that he was the murderer. (*Id.*, Page ID 258, 261). At that point, he made a number of declarations indicative of his desire to be arraigned. (*Id.*, Page ID 258, 261).

The questioning, however, still did not stop. Finally, Cooper admitted that he had, in fact, entered Jenkins' home on the night of the murder. Once he did, as Cooper further explained, he had thrown an extension cord to Mark Bollis in order to tie up McKillop. Together, he and Bollis forced McKillop to the floor, where Dennis McKiddie shot McKillop in the head. (AT Br., R. 9, Page ID 20; 5/6/11 TR., p. 44-48.)

### D.  Lower Court Proceedings

#### 1.  Michigan State Trial Court

Cooper was tried in Michigan state court. Prior to those proceedings he moved to suppress his statements made from the third interview, on March 3, 2010, but the trial court denied his motion. (*See* Opinion, R. 5.18, Page ID 886.) Notwithstanding, the prosecutor agreed not to use proof from the March 3 interview affirmatively. However, during his questioning of Detective Wehby, defense counsel referenced certain statements made by Cooper at the March 3 interview. (5/6/11 Tr., R. 5.14, Page ID 814, 821, 824-25.) Defense counsel then moved for the interview's admission into evidence. (*Id.*)

At the close of the proceedings, Cooper was convicted of first-degree felony murder and second-degree murder, though the latter count was subsequently vacated on double-jeopardy grounds. Cooper was sentenced to life in prison.

#### 2.  Proceedings on Direct Appeal

The Michigan Court of Appeals affirmed Cooper's judgment of conviction. (Opinion, R. 5.18, Page ID 877.) The court held that Cooper had not "unequivocal[ly] and unambiguous[ly] invoke[ed] [] his right to remain silent, during his first custodial interview on March 2, 2010," (*id.*, Page ID 878), but that he had properly invoked the right with respect to his second custodial interview on March 2, 2010. However, the appellate court concluded that even if the trial court had committed error in admitting Cooper's statements from the second custodial interview, the error was harmless beyond a reasonable doubt. (*Id.*, Page ID 879). The court also rejected Cooper's argument that his interview statements had been made involuntarily. (*Id.*, Page ID 881.)

Finally, the court ruled that Cooper had waived any challenge to the admission of his statements from the third custodial interview on March 3, 2010 under Michigan's invited-error doctrine. Namely, the court concluded that defense counsel had invited admission of the March 3 interview by asking questions that implicated the interview during his cross-examination of Detective Wehby, and then subsequently moving to admit the interview transcript and play all of the taped interviews for the jury. (*Id.*, Page ID 880-81). Because of its ruling on Cooper's procedural default, the court declined to reach the merits of Cooper's claim that the statements from the third custodial interview were admitted in violation of his right to remain silent. (*Id.*)

Thereafter, the Michigan Supreme Court denied Cooper's motion for leave to appeal. (Order, R. 5.20, Page ID 1337.)

### 3.  Federal Habeas Proceedings

Cooper then filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254(d) in the United States District Court for the Eastern District of Michigan. The district court denied the petition. In doing so, the court made a number of determinations regarding the March 2 custodial interviews.

First, the district court held that the Michigan Court of Appeals reasonably concluded that Cooper's statement made during the first custodial interview on March 2 was not an unambiguous assertion of his Fifth Amendment right to remain silent. (*Id.*, Page ID 1660).

Second, the district court held that the Michigan Court of Appeals had reasonably concluded that Cooper had clearly and unambiguously invoked his right to remain silent during the second March 2 interview, meaning that the portion of the interview following his invocation should have been excluded. The district court also concluded that the state appellate court appropriately held that any error in the trial court's admission of the evidence was harmless, and therefore not contrary to, nor an unreasonable application of, Supreme Court precedent. The district court found that the state court had offered a reasonable basis for its harmless error conclusion, which included emphasizing the facts that (1) Cooper had not made any incriminating statements after invoking his right to remain silent, and (2) nothing he had stated

during that portion of the interview contradicted or supplemented his previous statements made before his *Miranda* rights were properly invoked.

Third, the district court held that it was not unreasonable for the Michigan Court of Appeals to apply a well-established procedural bar under Michigan state law—the invited-error doctrine—when holding that Cooper's challenge to the admission of statements made during the March 3 interview was procedurally defaulted. As the district court further explained, the basis for appellate court's application of this procedural bar was correct given that it had reasonably relied on the fact that defense counsel had first brought up the March 3 interview during cross-examination of Detective Wehby, and then had actually moved to have the entire interview admitted and played for the jury. In this regard as well, the district court emphasized that Cooper "ha[d] not alleged cause and prejudice to excuse the default, nor ha[d] he show[n] that failure to consider the claim would work a manifest injustice." (*Id.*, Page ID 1662.) Finally, the state court concluded that Cooper's statements were voluntary, and neither contrary to, nor an unreasonable application of, Supreme Court precedent.

Following entry of its order denying habeas relief, the district court granted Cooper a certificate of appealability limited to his challenge to the admissibility of his statements made during the March 3 interview. (*Id.*, Page ID 1669.) However, the court denied Cooper's request for a certificate of appealability with respect to his challenges related to both of the March 2 interviews, as well as his challenge regarding the voluntariness of all of his interview statements. (*Id.*)

This court denied Cooper's request for an expanded certificate of appealability relating to the March 2 interviews. Therefore, now, we evaluate solely Cooper's challenge to the admission of statements made during the third custodial interview, which took place on March 3, 2010.

## II.

During oral argument, the government conceded that Cooper had "clearly and unequivocally" invoked his right to remain silent during the third custodial interview. Consequently, we will assume that the state trial court committed error in admitting statements from that interview that came after Cooper's invocation of his constitutional right. However, in

order to obtain habeas relief, Cooper still must prove that the admission of his statements had a "substantial and injurious effect or influence in determining the jury's verdict." *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015) (quotations and citations omitted). As explained below, we conclude the admission of Cooper's statements constituted harmless error because of the overwhelming evidence, apart from those statements, demonstrating his guilt of felony murder beyond a reasonable doubt. Therefore, we agree with the district court that there is no basis to grant habeas relief.[4]

## A. Standard of Review

When a statement or confession of an accused party is admitted into evidence in violation of the Fifth Amendment, the admission constitutes a constitutional error that is subject to our harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 310–11 (1991) (Rehnquist, C.J., delivering the opinion of the Court with respect to this issue). Furthermore, when a state court makes a harmless error determination, that finding is entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). *Ayala*, 576 U.S. at 268.[5]

Here, the Michigan Court of Appeals determined that the trial court erred in admitting statements made by Cooper one hour into his second custodial interview on March 2, when he, as the court determined, properly invoked his Fifth Amendment right to silence. Notwithstanding, the appellate court ultimately determined that the trial court's error was harmless. However, the appellate court did not make a harmlessness determination with respect to the trial court's admission of Cooper's March 3 statements. (*See* Opinion, R. 5.18, Page ID 879–81 (holding that admission of Cooper's post-invocation statements in the March 2 interview was harmless beyond a reasonable doubt, but declining to review admission of the March 3 statements)).

---

[4]Because our holding is determinative in affirming the denial of Cooper's habeas petition, we need not address the state court's ruling that Cooper procedurally defaulted his challenge to the admissibility of statements made during the March 3 interview under Michigan's invited-error doctrine. *See People v. McPherson*, 687 N.W.2d 370, 379 (Mich. Ct. App. 2004) (citing *People v. Jones*, 662 N.W.2d 376 (Mich. 2003)).

[5]This means that the accused—in this case, Cooper—must demonstrate that the state court's determination was objectively unreasonable.

The State argues that AEDPA and *Chapman v. California*, 386 U.S. 18 (1967), provide the proper standard of review for this case.  Specifically, it requests AEDPA deference because it contends that the logic of the appellate court's harmless error determination in relation to Cooper's statements made on March 2 (as well as the government's evidence on which that analysis relies), should "appl[y] with equal force" to our court's habeas review of the question regarding whether any error in the trial court's admission of any part of the third custodial statement is harmless.  Second Appellee Br. at 34.  However, the state's argument is misplaced.  Certainly, the evidence of Cooper's guilt derived from his admitted statements from the March 2 interview is relevant to our analysis of the possible "substantial and injurious effect" the trial court's admission of his statements made from the March 3 interview may have had on the jury's ultimate verdict.  *See Brecht v. Abrahamson*, 507 U.S 619 (1993).  However, to essentially infer or "pretend," as the State appears to be asking us to do, that the Michigan appellate court made a merits determination on Cooper's challenge to the admissibility of the statements from the March 3 interview, would be entirely improper.  The appellate court avoided assessing the merits of Cooper's challenge of the March 3 statements by ruling instead that his challenge was procedurally defaulted under Michigan's invited-error doctrine.  Because the state appellate court made no determination on the merits of Cooper's constitutional challenge to the March 3 interview, this court applies *de novo* review to the harmless error question presented on appeal here.  *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005); *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019); *see Pinchon v. Myers*, 615 F.3d 631, 638 (6th Cir. 2010).

Accordingly, "[i]n federal habeas proceedings, the *Brecht* standard governs and the federal court will not grant habeas relief unless the state error "resulted in 'actual prejudice.'" *O'Neal*, 933 F.3d at 624 (quoting *Ayala*, 576 U.S. at 267 (quoting *Brecht*, 507 U.S. at 637)).  "[R]elief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Ayala*, 576 U.S. at 267–68 (quotations and citations omitted).  "'[G]rave doubt' about whether the error was harmless means that 'the matter is so evenly balanced that [the court] feels [it]self in virtual equipoise as to the harmlessness of the error." *O'Neal*, 933 F.3d at 624 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).  Moreover, "'[t]here must be more than a 'reasonable possibility' that the error was harmful," *Ayala*, 576 U.S. at 268 (quoting *Brecht*, 507 U.S. at

637).  The "State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error."  *Id.* (citation and quotations omitted).

As discussed below, we hold based on *Brecht* and *Ayala* that Cooper was not actually prejudiced by admission of statements from the third custodial interview.  On this ground, we affirm the district court's denial of habeas relief.

## B.  Analysis

Cooper was convicted of first-degree felony murder under Mich. Comp. Laws § 750.316(1)(b).  (Opinion, R. 5.18, Page ID 877.).  A conviction under this provision requires that the government present proof demonstrating a "[m]urder committed in the perpetration of, or attempt to perpetrate" certain enumerated felonies, which include: robbery, breaking and entering, home invasion in the first or second degree, larceny, extortion, kidnapping, torture, and unlawful imprisonment.  Mich. Comp. Laws § 750.316(1)(b).

Conviction for felony murder is not contingent on whether the defendant actually committed the murder himself, so long as (1) he knowingly participated in the common enterprise to commit one of the enumerated felonies listed in Mich. Comp. Laws § 750.316(1)(b); and (2) his participation in that enumerated felony foreseeably led to a murder.  *See* Mich. Comp. Laws § 767.39; *see also People v. Robinson*, 715 N.W.2d 44, 50 (Mich. 2006) (aider and abettor to assault that resulted in homicide liable for homicide); *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980) ("A jury can properly infer malice [for purposes of felony murder] from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm."); *People v. Bryant*, 245 N.W.2d 716, 719 (Mich. Ct. App. 1976) ("[I]f the defendant aided and abetted [the principal] in the commission of what defendant thought would be an unarmed robbery, defendant could not be acquitted of felony murder simply because the robbery turned out to be armed instead of unarmed.").  This means that regardless of whether Cooper actually entered the house and pulled the trigger that killed McKillop, he can still be convicted of felony murder based on his participation in a felony—which, in this case, was extortion.

To prove that Cooper committed extortion, the prosecution had to show that he (or anyone he aided) threatened to injure the victim, that he (or anyone he aided) made the threat willfully in order to obtain money or make the victim do something against his will, and that he (or anyone he aided) made the threat orally. Mich. Comp. Laws § 750.213. In light of the statute's elements, the Michigan Court of Appeals was accurate in its outlining of the relevant evidence established by the government to demonstrate that Cooper had participated in a common enterprise to commit the felony of extortion, which foreseeably led to the murder of McKillop. In so doing, the appellate court referenced Cooper's statements from his first custodial interview (all of which were admitted by the trial court without Cooper's dispute, given his acknowledgement that he had not yet allegedly invoked his *Miranda* rights), where he admitted "to breaking into the house where [McKillop] [had resided] a few days before the murder." (Opinion, R. 5.18, Page ID 879.) Through this break-in, as acknowledged by Cooper, he had an "intent to hurt Jenkins"; and to accomplish that mission, "he had taken an extension cord from a lamp with the plan of tying up Jenkins." (*Id.*) As the court further outlined, Cooper had even established explicitly that he was at the scene of the crime—"on the porch" of Jenkins's home during "the night of the murder." (*Id.*) And finally, Cooper explained that his specific purpose in undertaking these multiple visits to Jenkins's house was to encourage Jenkins to repay money he owed by tying him up and "maybe beat[ing] the shit out of him[.]" (3/2/10 Tr. R. 1.5, Page ID 123-25.) In fact, these statements from Cooper himself—all obtained from the first custodial interview—proved so powerful for the government's case that the prosecutor even claimed explicitly in his opening statement that this evidence alone made Cooper liable as an aider and abettor to felony murder. (5/3/11 Tr., R. 5.12, Page ID 709.) The prosecutor expanded upon these statements in his state court appellate brief by outlining all of the properly introduced evidence that the State obtained prior to Cooper's first invocation of his right to silence. We agree with the State, and find that this undisputed evidence is overwhelming and more than sufficient to render inconsequential to the verdict any of Cooper's statements made after he allegedly invoked his Fifth Amendment right.

Yet even with the powerful statements of guilt offered by Cooper during his first custodial interview, as noted by the state appellate court, the jury's guilty verdict could also have reasonably relied upon the testimony of Lolley, the individual who initially alerted police of

Cooper's involvement in McKillop's death.  Despite Cooper's claims to the contrary, a jury could have deemed Lolley credible and given his testimony powerful weight in issuing its verdict, given, according to Lolley, prior to the murder, Cooper had confided in Lolley that he had been paid $3,000 to kill someone, and did in fact, kill someone, though it turned out to be the wrong person.  (5/5/11 TR. R. 5.13, Page ID  766-67, 768-69, 774).  Nonetheless, Cooper proceeded in sharing even more specific details of the crime to Lolley: namely, Cooper recounted that his conduct on the night of the murder included (1) tying up McKillop, (2) having him lie on the floor, (3) putting a pillow over his head, and (4) shooting him six to nine times. (*Id.*, Page ID  766-67, 769); *accord People v. Cooper*, No. 304610, 2013 WL 2223896, at *1 (Mich. Ct. App. May 21, 2013).[6]

Finally, as the Michigan Court of Appeals concluded, the jury could have reasonably relied on Cooper's suspicious actions during the first custodial interview, which to the court, seemed to suggest that Cooper feared his DNA had been found at the scene of the murder and could therefore still be linked to him now.  Indicative of the reasonableness of this inference was the fact that at the end of the first custodial interview, Cooper put each used cigarette stub in his shirt pocket, broke his Styrofoam cup apart and placed the pieces in his pockets, and then placed all of his used paper towels in his pockets also.  (5/5/11 Tr., R. 5.13, Page ID 801-02.)  Yet most damningly, when asked directly by investigators if he had ever killed anyone, Cooper appeared evasive: instead of answering the question, he simply stated that he had not killed for money, nor had he ever held anyone down to be beaten or killed.  (5/5/11 Tr., R. 5.13, Page ID 803; 5/6/11 Tr., R. 5.14, Page ID 819.)  Collectively, these statements and actions create a reasonable inference that Cooper had played a role in the common enterprise of committing the felony of extortion, which foreseeably led to McKillop's murder.

We disagree with Cooper's characterization that the above evidence is "weak and entirely circumstantial." (Appellant's. Br. at 41).  As an initial matter, a credible testimony, like that from

---

[6]During Lolley's testimony at trial, he stated that Cooper had confessed to the killing, admitting that he tied Jenkins up, and "laid him down on the floor[,] [p]ut a pillow on his head and shot him in the back of the head. Emptied the gun out." (5/5/11 Tr., R. 5.13, Page ID 766.)  The state appellate court found this testimony to be relevant in its harmless error analysis of the admission of Cooper's statements from the March 2 custodial interview. *People v. Cooper*, No. 304610, 2013 WL 2223896, at *3 (Mich. Ct. App. May 21, 2013) (per curiam).

Lolley, which includes statements recounting Cooper's murder confession, does not generally constitute "circumstantial" evidence in the criminal justice system. Yet even if the testimony were deemed "circumstantial," criminal cases—particularly those in which the crime at issue occurred over four decades ago now—necessarily rely on circumstantial evidence. And indeed, the Supreme Court has recognized that circumstantial evidence is entitled to equal weight as direct evidence; therefore, the prosecution may meet its burden entirely through circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Holland v. United States*, 348 U.S. 121, 140 (1954).

In light of the above, there is no reasonable probability that any error in the state trial court's admission of Cooper's March 3 statements affected the jury's verdict, as required under *Brecht* and *Ayala*. Independent of the March 3 statements, the government had presented overwhelming and more than sufficient proof to demonstrate, beyond a reasonable doubt, that Cooper was guilty of felony murder. Consequently, Cooper cannot carry his burden of showing actual prejudice to his case. *Ayala*, 576 U.S. at 267. Accordingly, we **AFFIRM** the harmless error finding of the district court.

### III.

To summarize, even with the government's concession that Cooper properly invoked his Fifth Amendment right to silence midway through the third custodial interview, meaning the trial court committed error in admitting any statements that were spoken thereafter, we still conclude that the trial court's admission of those statements constituted harmless error under *Brecht* and *Ayala*. Accordingly, we **AFFIRM** the district court's final order denying Cooper's petition for habeas corpus.

—————————

**DISSENT**

—————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  David McKillop's murder case went cold for nearly thirty years before Petitioner-Appellant Wilbern Woodrow Cooper was arrested and later convicted for the murder.  It is abundantly clear that local detectives elicited from Cooper a confession that he aided and abetted the murder of McKillop after Cooper plainly invoked his right to remain silent during the third custodial interview in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Yet the majority concludes that the admission of Cooper's full-throated confession did not have a substantial and injurious effect on the jury verdict as required by *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  The majority instead undertakes a sufficiency-of-the-evidence review.  Moreover, the majority conspicuously fails to consider the nature of a full confession in relation the remaining, far from overwhelming, evidence against Cooper: testimony from a witness who suddenly came forward thirty years later (in exchange for the prosecution's assistance with drunk driving charges); Cooper's vague prior custodial statements about his mere presence on McKillop's porch, and Cooper's suspicious behavior during his custodial interviews.  There was a complete dearth of other direct or physical evidence linking Cooper to McKillop's murder, such as eye-witness testimony, identification of the murder weapon, or even DNA evidence.  Cooper's full confession that he helped overpower and tie up McKillop immediately prior to his death was by far the best evidence against Cooper.  And it is obvious that the prosecution knew this—it emphasized Cooper's confession again and again in its closing argument.  Against this backdrop, grave doubt exists as to whether the admission of Cooper's confession had a substantial and injurious effect on the jury's verdict.  Cooper also did not procedurally default this claim on the basis of Michigan's invited-error doctrine.  Therefore, I would grant habeas relief.

"[I]n order to grant habeas relief, the court must have at least 'grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict."'"  *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  When the court believes "that 'the matter is so evenly

balanced that [the court] feels [it]self in virtual equipoise as to the harmlessness of the error," the court has grave doubt. *Id.* (alterations in original) (quoting *O'Neal*, 513 U.S. at 435). "An 'uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict.'" *Hendrix v. Palmer*, 893 F.3d 906, 919 (6th Cir. 2018) (quoting *O'Neal*, 513 U.S. at 435); *see also Tolliver v. Sheets*, 594 F.3d 900, 924 (6th Cir. 2010). This standard from "'*Brecht* is always the test,'" "whether the state court evaluated harmlessness under *Chapman* [*v. California*, 386 U.S. 18 (1967)]," or whether the state court did not undertake a harmless-error analysis. *Reiner v. Woods*, 955 F.3d 549, 556 (6th Cir. 2020) (citations omitted); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)].").[1]

The majority opinion proceeds as if the *Brecht* test is synonymous with sufficiency-of-the-evidence review. Rather than analyzing the impact of Cooper's full confession upon the jury, which at the very least requires its comparison with the other evidence against Cooper, the majority simply recites the other evidence against Cooper as outlined by the state appellate court. Majority Op. at 16–17. But we are "prohibited from 'stripping the erroneous action from the whole and determining the sufficiency of what is left standing alone.'" *Hendrix*, 893 F.3d at 919 (quoting *Ferensic v. Birkett*, 501 F.3d 469, 483 (6th Cir. 2007)). The majority's harmless-error analysis is tantamount to such an approach. Considering the elements of the crimes of which Cooper was convicted, the nature of his confession, the otherwise thin evidence against him, and the value that the government assigned to his confession, it was not harmless error to admit Cooper's confession at trial.

---

[1]The Warden argues that the state court's harmless-error analysis of the admission Cooper's statements from the second custodial interview should count as a harmless-error analysis of the admission of Cooper's confession from the third custodial interview, justifying the application of AEDPA/*Chapman*, as well as *Brecht*. Second Appellee Br. at 34–37. First, as the majority correctly points out, Majority Op. at 13–14, it would be inappropriate to apply the harmless-error analysis for Cooper's earlier statements to Cooper's later confession. There is no support for this approach, nor does it make sense given the qualitative difference between Cooper's earlier statements and his later confession. Second, we have consistently rejected the Warden's argument that a petitioner must satisfy AEDPA/*Chapman* and *Brecht*. *Davenport v. MacLaren*, 964 F.3d 448, 454–59 (6th Cir. 2020); *Reiner*, 955 F.3d at 557; *O'Neal*, 933 F.3d at 624–25.

Cooper was convicted of second-degree and felony murder.**2** The elements of second-degree murder in Michigan are "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v. Smith*, 731 N.W.2d 411, 414–15 (Mich. 2007). First-degree felony murder is "[m]urder committed in the perpetration of" certain enumerated felonies, including larceny and extortion. Mich. Comp. Laws § 750.316(1)(b). The jury was instructed on principal and aider-and-abettor theories of liability for both murder charges, as well as extortion and larceny as underlying felonies for felony murder. R. 5-16 (May 10, 2011 Trial Tr. at 79–88) (Page ID #857–59).**3** Therefore, Cooper could have been convicted for murder as a principal or as an aider and abettor. I address both possibilities.

I begin with principal liability. The single piece of evidence that Cooper committed the murder was Bill Lolley's testimony. Lolley testified that Cooper told him that Cooper was being paid to kill McKillop's roommate, Paul Jenkins, for $3,000 and that Cooper offered Lolley $1,500 to be his getaway driver. *People v. Cooper*, No. 304610, 2013 WL 2223896, at *1 (Mich. Ct. App. May 21, 2013) (per curiam). Lolley also testified that after the murder, Cooper told him "that [Cooper] laid the victim down on the floor, put a pillow on his head, and shot him repeatedly in the head." *Id.* Certainly, this testimony is relevant. But Lolley's testimony presented significant credibility issues. His testimony was thirty-years stale, raising questions about Lolley's memory; his testimony was thirty-years late, raising issues about his motives in coming forward now; and his testimony was given in exchange for the State's assistance with previous drunk driving charges, raising serious concerns about bias, R. 5-13 (May 5, 2011 Trial Tr. at 7) (Page ID #766). Lolley was thus significantly impeached, weakening the evidentiary value of his testimony. *See Eddleman v. McKee*, 471 F.3d 576, 587 (6th Cir. 2006) (concluding that the bias of witnesses receiving immunity from the prosecution and benefits in exchange for testifying contributed to error that was not harmless), *overruling on other grounds recognized by Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007). Cooper's confession bolstered Lolley's

---

**2**To avoid double-jeopardy issues, the state court vacated Cooper's second-degree murder conviction. *Cooper v. Berghuis*, No. 2:15-10679, 2018 WL 1203494, at *2 (E.D. Mich. Mar. 8, 2018); *see also* R. 5-18 (J.) (Page ID #899).

**3**Accessories in Michigan are subject to the same liability as the principal. Mich. Comp. Laws § 767.39.

testimony, mitigating any credibility issues.   Like Cooper's confession, Lolley's testimony established that McKillop was tied up and that Cooper was physically inside the house.  *See* R. 5-16 (May 10, 2011 Trial Tr. at 11) (Page ID #840).  Cooper's confession was inconsistent with Lolley's testimony in terms of whether Cooper was the principal, the shooter, and whether the murder was premeditated based on his offer to pay Lolley.  However, the admission of Cooper's confession could have tipped the scales for the jury in favor of believing Cooper's admission of guilt but crediting the details from Lolley's testimony.  One cannot be "certain that the error [in admitting Cooper's confession] had no effect or only a small effect" on the jury's verdict to the extent that the jury relied on principal liability.  *Hendrix*, 893 F.3d at 919.

Next, I address the possibility that the jury convicted Cooper as an aider and abettor for the murder.  To prove that a defendant aided and abetted the commission of a crime, the prosecution must prove that "(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement."  *People v. Robinson*, 715 N.W.2d 44, 47–48 (Mich. 2006) (alteration in original) (quoting *People v. Moore*, 679 N.W.2d 41, 49 (Mich. 2004)).  The crux of this appeal falls upon the second element.  Admitting Cooper's confession was not harmless because Cooper's confession during the third custodial interview was a full confession.  Moreover, there was no other evidence that Cooper performed acts or gave encouragement that assisted in McKillop's murder for the second-degree murder charge or extortion or larceny for the felony murder charge, and the government overtly emphasized the confession.

There is simply no question that Cooper's confession that he was inside the home and helped tie up McKillop was the most compelling evidence against Cooper and the *only* evidence that he took actions to assist in the commission of any crime the night of McKillop's murder.

> A confession is like no other evidence.  Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact on the jury . . . ."

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (alterations in original) (quoting *Bruton v. United States*, 391 U.S. 123, 139–40 (1968) (White, J., dissenting)). This is particularly so of "a full confession in which the defendant discloses the motive for and means of the crime." *Id.* Cooper's post-*Miranda* statements undoubtedly constitute a full confession to aiding and abetting second-degree and/or felony murder. He confessed to being inside of the house, helping wrestle McKillop to the ground, and throwing the extension cord to an associate to tie McKillop up. *See Eddleman*, 471 F.3d at 587 ("Like the defendant in *Fulminante*, Eddleman gave a full confession, including both a direct admission of guilt and detailed information about the crime . . . ."). Accordingly, the "tempt[ation of] the jury to rely upon that evidence alone in reaching its decision" cannot be discounted. *Id.* (quoting *Fulminante*, 499 U.S. at 296).

The grievous impact of Cooper's full confession is apparent when compared to the only other evidence against him—his statements from the first and second custodial interviews about his presence on McKillop's front porch, Lolley's testimony, and Cooper's behavior during the custodial interviews. The majority argues that Cooper's first and second custodial interviews demonstrated that Cooper was "on the porch" during the murder. Majority Op. at 16. But Cooper's statement that he was on the porch is not tantamount to a confession of aiding and abetting because under Michigan law the "[m]ere presence, even with knowledge that an offense is about to committed, or is being committed is not enough to make a person an aider or abettor." *People v. Burrel*, 235 N.W. 170, 171 (Mich. 1931) (citation omitted); *see also People v. Worth-McBride*, 929 N.W.2d 285, 286 (Mich. 2019) (citing *Burrel* for this proposition). In any case, Cooper's statements from the custodial interviews that he was on the porch were impeached significantly. On defense counsel's direct examination of Detective Wehby, Detective Wehby confirmed that a photograph of Jenkins's house demonstrated that the house did not have a porch. R. 5-12 (May 3, 2011 Trial Tr. at 42) (Page ID #715). True enough, the majority discusses evidence demonstrating that Cooper had the requisite intent to aid and abet, but it fails to show that Cooper performed acts or gave encouragement that assisted in the commission of the crime.[7]

---

[7]Cooper does not otherwise confess to performing acts or giving encouragement that assisted the commission of the crime. For example, he did not admit to taking the extension cord from the first visit to the

Lolley's testimony and Cooper's behavior during the custodial interviews offer little support for Cooper's conviction without the admission of the later confession to bolster them. As set forth above, without Cooper's later full confession to being inside of the home and participating in the events leading up to the murder, Lolley's testimony lacked credibility. In any case, Lolley's testimony had no import upon Cooper's culpability as an aider and abettor because Lolley's testimony put Cooper behind the gun as the principal. Nor did Lolley's testimony address Cooper's involvement in any extortion or larceny. And though Cooper's conduct during the interviews was suspicious, such behavior during a custodial interview is weak circumstantial evidence at best that Cooper was involved in McKillop's murder. Suspicious behavior could reflect guilt of another crime or general apprehension of law enforcement. There is grave doubt whether the admission of Cooper's confession caused the jury to consider more seriously Cooper's suspicious behavior during the interview. In short, the remaining evidence against Cooper was weak and thus benefitted from the admission of Cooper's confession, compounding the effects of the confession's admission.

Ultimately, Cooper's confession was the only direct evidence that he acted to encourage the crimes, giving it substantial probative value in comparison to the other evidence against him. *Cf. Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008) (noting that a defendant's prior "videotaped statements were cumulative of his prior written statements," mitigating the effect of the admission of the videotaped statements under *Brecht*). There was no other direct or physical evidence implicating Cooper. *See Moore v. Berghuis*, 700 F.3d 882, 889–90 (6th Cir. 2012) (concluding that a lack of direct evidence under the circumstances was indicative of error under *Brecht*); *Bachynski v. Stewart*, 813 F.3d 241, 250 (6th Cir. 2015) (highlighting extensive physical evidence linking the petitioner to the murder, including fingerprints, bloody clothing found in the petitioner's possession, and the fact that the victim's body was found in the trunk of the victim's car that the petitioner was driving). There were no eye-witness accounts, and the State declined to run a DNA analysis between Cooper's DNA sample and the only physical evidence, hair, that

---

house, nor did he confess to supplying the extension cord the night of the murder. R. 5-19 (First Custodial Interview at 23, 76) (Page ID #1233, 1246). Nor did Cooper admit to driving the car to the house the night of the murder. R. 5-19 (Second Custodial Interview at 7) (Page ID #1257) ("I was just there to ride along with them.").

it had from the scene of the crime. R. 5-13 (May 5, 2011 Trial Tr. at 82–84) (Page ID #784–85). Thus, Cooper's confession was crucial evidence against him.

Finally, the prosecution placed immense value on Cooper's full confession for the overall case and to prove the second element of aiding and abetting, performing acts to assist in the underlying crime. Cooper's confession to helping restrain and tie up McKillop was the backbone of the prosecution's case against him. From the outset of its closing argument, the prosecution argued that Cooper was the "shooter" or an "active participant," an aider and abettor, based on his confession that Cooper "burst in," "rushed [McKillop]," and "tied [McKillop] up," R. 5-16 (May 10, 2011 Trial Tr. at 8–9) (Page ID #839), all information that came from Cooper's confession. Later, the prosecution pointed to the confession to demonstrate that Cooper "did something to assist in the commission" of the crimes. *Id.* at 22, 24–25 (Page ID #842–43). But the pièce de résistance of the prosecution's closing argument was its line-by-line narration of Cooper's full confession from his third custodial interview. *Id.* at 29–34 (Page ID #844–45). The prosecutor emphasized the confession in detail while providing his own commentary for more than five pages of the transcript. *Id.* The prosecution spent the most effort "go[ing] through" Cooper's complete confession "just to tie that into the aiding and abetting statute." *Id.* at 24 (Page ID #843).

The prosecution's treatment during closing arguments of the other evidence demonstrates the importance of Cooper's confession to aiding and abetting felony murder and second-degree murder. The prosecutor pointed to Lolley's testimony, but only in support of the first-degree murder charge. *Id.* at 11, 16 (Page ID #840–41). Notably, Cooper was not convicted of first-degree murder. The prosecutor once briefly pointed to statements from Cooper's first and second custodial interviews and his behavior during the custodial interviews. *Id.* at 19–20, 25 (Page ID #842–43). But the "the centerpiece of this case" turned on Cooper's confession that he helped subdue McKillop and tie him up prior to his murder. *Eddleman*, 471 F.3d at 587 (quoting *Fulminante*, 499 U.S. at 297).

In *Brecht*, the error was harmless because there was "weighty" evidence against the defendant and the prosecution's mentions of the statements after the defendant invoked his *Miranda* rights were "infrequent." 507 U.S. at 639. Here, however, there was no "weighty"

evidence against Cooper.  The State's case otherwise turned on weak circumstantial evidence: Lolley's incredible testimony, Cooper's impeached statements that he was simply on the porch, and Cooper's suspicious behavior during the interviews.  And once Cooper's full confession was admitted, it was clear that the prosecution relied on his confession, especially during closing arguments.  At the least, "the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error," satisfying *Brecht*.  *Hendrix*, 893 F.3d at 919 (quoting *O'Neal*, 513 U.S. at 436).  Accordingly, the erroneous admission of Cooper's confession was not harmless.

For these reasons, Cooper is entitled to habeas relief.  Therefore, I dissent.